In the

# United States Court of Appeals
## For the Seventh Circuit
_____

No. 13-1106

CATERPILLAR LOGISTICS, INC.,

*Petitioner*,

*v.*

THOMAS E. PEREZ, Secretary of Labor,

*Respondent*,

*and*

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,

*Intervening Respondent*.

_____

Petition for Review of an Order of the
Occupational Safety and Health Review Commission

_____

SUBMITTED NOVEMBER 27, 2013 — DECIDED DECEMBER 12, 2013

_____

Before BAUER and EASTERBROOK, *Circuit Judges*, and CHANG, *District Judge*.[*]

_____

[*] Of the Northern District of Illinois, sitting by designation.

EASTERBROOK, *Circuit Judge*. The first time this case was here, we held that an administrative law judge erred by failing to consider evidence undermining the view espoused by the expert whose testimony the ALJ accepted. We remanded so that this evidence could be addressed. *Caterpillar Logistics Services, Inc. v. Solis*, 674 F.3d 705 (7th Cir. 2012). On remand, the ALJ again held that Caterpillar Logistics must pay a penalty for failing to report an injury as work-related, 2012 OSAHRC LEXIS 118 (Oct. 9, 2012), and the Occupational Safety and Health Review Commission again declined to review the ALJ's decision. 2012 OSAHRC LEXIS 119 (Nov. 20, 2012). Caterpillar has filed another petition for judicial review.

One of Caterpillar's workers, MK, developed epicondylitis. (Epicondylitis is an inflammation of one or more tendons near the elbow. Epicondylitis of the outer elbow is known colloquially as tennis elbow and epicondylitis of the inner elbow as golfer's elbow, though most instances are unrelated to sports.) A regulation requires employers to report injuries to the Department of Labor if "the work environment either caused or contributed to the resulting condition". 29 C.F.R. §1904.5(a). MK's work environment was a packing department, where workers remove items from containers and place them in boxes for shipping. That job requires repetitive hand movements and turning (pronation) of wrists, elbows, and shoulders. Caterpillar convened a five-person panel, which included three board-certified specialists in musculoskeletal disorders. Relying on guides issued by the National Institute for Occupational Safety and Health and the American Medical Association—both of which conclude that repetitive motion plus force (weight or impact) can cause epicondylitis, and that pronation plus force also can cause the condition, but that repetitive motion alone does not—the panel

concluded that work in the packing department could not have caused MK's epicondylitis.

The Secretary of Labor does not contend, and the ALJ did not find, that MK's tasks entailed "force" within the meaning of these guides. At a hearing, several experts supported the conclusion of Caterpillar's panel not only on the basis of the guides but also by reference to epidemiological studies, which had found no relation between epicondylitis and repetitive motion unless the motion entailed force, and by reference to Caterpillar's own experience. Just one worker in the packing department's history (MK herself) has developed epicondylitis, and the experts thought that this demonstrates that the sort of tasks performed there do not cause or contribute to epicondylitis.

Against this, the Secretary offered a single witness: Robert Harrison, a Clinical Professor of Medicine at the University of California at San Francisco. He acknowledged that the packing department is a light-force environment but testified that, nonetheless, the combination of moderate repetition plus pronation of the wrist, hand, and forearm must have caused MK's condition. He did not explain, however, why if this is so no other worker in the history of Caterpillar Logistics' packing operations has been troubled by epicondylitis. Nor did he discuss any epidemiological study, pro or con. Harrison's view appears to be one that few if any other specialists espouse, but the ALJ accepted it. In doing so the ALJ, like Harrison, ignored the epidemiological studies and Caterpillar's experience. That is why we remanded for further proceedings. We held that Caterpillar had failed to exhaust its administrative remedies with respect to the epidemiological studies, which it did not call to the Commission's

attention, but that it had preserved an objection to the ALJ's disregard of the experience of its own packing department.

After disposing of some preliminary matters that we need not mention, the ALJ began his discussion of Caterpillar's experience by asserting that our decision rests on a legal error and is "inconsistent with the statutory and regulatory scheme for recording injuries". 2012 OSAHRC LEXIS 118 at *27. He called Caterpillar's experience "purported" countervailing evidence and asserted that it is entitled to little weight because, among other things, other employers will not necessarily have a "sufficient amount of operating history to establish whether [their] experience of a particular injury is consistent with, or in excess of, incidence rates in the general population." *Id*. at *28. The ALJ then observed that Dr. Harrison had testified that "a finding that epicondylitis occurred at [Caterpillar] at a rate greater than that of the general population would *confirm* his finding that [the worker's] epicondylitis was work-related; however, he also stated that the historical data is not a consideration as to whether a particular incidence of epicondylitis is work-related". *Id*. at *29 (emphasis in original). In other words, Harrison stated that an employer's experience could support his position but not disprove it. Since the ALJ had decided to accept Harrison's position, and Harrison had declared that evidence contrary to his position is worthless, the ALJ decided that Caterpillar's experience does not undermine his original conclusion.

This is circular. We remanded this case because the ALJ accepted a minority view within the medical profession without trying to reconcile that view with evidence—both epidemiological studies and Caterpillar's own experience.

Instead of carrying out that task by testing Harrison's con-clusions, the ALJ took them as established and then declared that, because Harrison himself did not think contrary evi-dence material, there is no need to engage with that evi-dence. Such a heads-I-win-tails-you-lose declaration does more to make a witness look like a quack than it does to support reliance on the witness's approach. Harrison's con-clusion that data can support a thesis but not undermine it is un-scientific and anti-intellectual; it is a hallmark of the sci-entific method to follow the data whichever way they point. We are surprised that an ALJ would echo such a position and that the full Commission would decline to intervene. Judges and other lawyers must learn how to deal with scien-tific evidence and inference. See *Jackson v. Pollion*, 733 F.3d 786 (7th Cir. 2013).

The prevailing view in the medical profession, which has both general (epidemiological) and specific (this workplace) support, is that repetitive motion *plus force* leads to the de-velopment of epicondylitis. A discipline's prevailing view may be wrong; better models and more evidence have over-turned many a confidently held belief. Prevailing views, and the data behind them, still must be considered; they cannot be ignored on the say-so of any witness. Yet the ALJ joined Harrison in disparaging statistical analysis. He wrote that epidemiological and employer-specific data do not count for much because "none of these [other] people are [sic] MK. Similar to the concept of the 'eggshell skull' plaintiff in civil litigation, you take your workers as they are." 2012 OSAHRC LEXIS 118 at *32. This is incompatible with our first opinion. It also misunderstands the bearing of statistics.

Harrison believes that light repetitive motion causes epicondylitis; the bulk of the profession thinks that force is necessary. The way to test whether Harrison is correct is to look at data from thousands of workers in hundreds of workplaces—or at least to look at data about hundreds of worker-years in Caterpillar's own workplace. Any given worker *may* have idiosyncratic susceptibility, though there's no evidence that MK does. But the antecedent question is whether Harrison's framework is sound, and short of new discoveries about human physiology only statistical analysis will reveal the answer. Any large sample of workers will contain people with idiosyncratic susceptibilities; the Law of Large Numbers ensures that their experience is accounted for. If studies of large numbers of workers show that the incidence of epicondylitis on jobs that entail repetitive motion but not force is no higher than for people who do not work in jobs requiring repetitive motion, then Harrison's view has been refuted.

Our first opinion posed, as a potential obstacle to relying on Caterpillar's experience, the question whether the sample size is large enough to draw a statistically significant inference given the rarity of epicondylitis in the general population. 674 F.3d at 709. The ALJ did not explore statistical significance on remand—indeed, he declined to reopen the record so that evidence on this issue could be adduced. Caterpillar's experience therefore cannot be discounted as reflecting a sample too small to support reliable conclusions.

One more subject deserves mention. The ALJ disparaged Caterpillar's experience in part because similar data "will not always be present in every case". 2012 OSAHRC Lexis 118 at *27–28. In other words, the ALJ bypassed available evidence because other employers might not be able to offer

the same kind of evidence. This is irrational. If the camera in a police car captures the events of a high-speed chase, the judiciary would not ignore that video just because other police cars lack cameras; likewise, if the police record an interrogation, courts will consider that information rather than wait for the day when all interrogations are recorded. Cf. *Scott v. Harris*, 550 U.S. 372 (2007) (not only relying on a video of a chase but also including it as part of the Court's opinion). Scientists recently used videos of an asteroid's entry over Russia, captured serendipitously by dashboard cams, to infer the size, mass, composition, velocity, entry path, and explosive force of the event. See Olga P. Popova, et al., *Chelyabinsk Airburst, Damage Assessment, Meteorite Recovery, and Characterization*, 342 Science 1069 (Nov. 29, 2013). No scientist would have dreamed of saying anything like: "Because few objects entering from space are recorded in such detail, we will ignore the evidence available about this entry." Yet that is what the ALJ did with Caterpillar's experience.

The Department of Labor has had ample opportunity to address the significance of Caterpillar's experience. It failed to do so and is not entitled to a third crack. The petition for review is granted, and the citation is vacated.