Jennifer **SPAHMER**, Petitioner,

v.

Todd **GULLETTE**, Respondent.

No. 03SC751.

Supreme Court of Colorado,
En Banc.

June 6, 2005.

---

Barry J. Seidenfeld, PC, Barry J. Seidenfeld, Denver, Anne Whalen Gill, PC, Anne Whalen Gill, Castle Rock, for the Petitioner.

Todd W. Gullette, Pro Se, Boulder.

Ronald D. Litvak, Litvak, Litvak, Mehrtens & Epstein, PC, Denver, Amicus Curiae for Colorado Chapter American Academy of Matrimonial Lawyers.

RICE, Justice.

In this appeal from an initial allocation of parental responsibilities pursuant to subsection 14–10–124(1.5), C.R.S. (2004), Petitioner Jennifer Spahmer (Mother) argues that the trial court abused its discretion when it ordered her to live in Colorado in close proximity to Respondent Todd Gullette (Father). We agree, and conclude that in an initial determination to allocate parental responsibilities, a court has no statutory authority to order a parent to live in a specific location. Rather, the court must accept the location in which each party intends to live, and allocate parental responsibilities accordingly in the best interests of the child. As a result, we reverse the court of appeals' holding and remand with instructions to return the case to the trial court for proceedings consistent with this opinion.

## I. Facts and Procedural History

Mother and Father met in Colorado in September 2000 and started dating. Shortly thereafter, Mother accepted a job as a financial analyst with Microsoft and moved to the state of Washington. Father continued to visit Mother in Washington and even considered moving there.

Mother learned she was pregnant in January 2001 and the parties subsequently got engaged. Father had originally planned to move to Washington, but changed his mind when he was offered a partnership with a

real estate company in Colorado. Consequently, in May 2001, Mother left her job with Microsoft and moved back to Colorado.

A daughter, Jordan, was born to the parties in September 2001. Around this time, the relationship between Mother and Father began to deteriorate. As a result, the parties broke off their engagement and began counseling to mend their relationship. Following this decision, they spent Thanksgiving in Arizona with Mother's extended family and applied for jobs there. Mother's stepfather, mother, and half-sisters offered to assist the parties and Jordan if they moved to Arizona. Despite this offer, the parties separated upon their return to Colorado. Father moved in with his parents and Mother continued to live in Father's town home with Jordan.

The parties differ as to the events giving rise to this litigation. Mother indicates that she asked and received Father's permission to spend the Christmas holiday with her family and Jordan. Accordingly, on December 10, 2001, Mother began the drive to Arizona, informing Father of her departure from the road. Father became very concerned and upset when he learned of Mother's departure. Though he conceded that he had agreed to Mother's spending the Christmas holiday with her family, he claimed not to have known that Mother was leaving on December 10. Father also claimed he was concerned because, unbeknownst to him, Mother had moved most of her belongings from his town home. Father assumed that Mother was planning to leave Colorado permanently with Jordan. Mother maintained that she removed her belongings from the town home because Father had expressed a desire to rent the place to someone else.

On December 10, 2001, in response to these events, Father filed an action for the allocation of parental rights and responsibilities regarding Jordan. In addition, he filed a motion requesting a restraining order requiring Mother to return Jordan to Colorado, and prohibiting Mother from subsequently taking Jordan from Colorado. Mother was served with process at her family's home in Arizona and returned to Colorado with Jordan after Christmas.

The trial court subsequently entered temporary orders restraining Mother from removing Jordan from Colorado, granting Mother sole decision-making authority concerning Jordan, and allocating parenting time between Mother and Father. Since the court's temporary orders provided that Mother must have either Father or the court's permission to remove the child from Colorado, Mother filed a "Motion for Forthwith Hearing on Removal of Minor Child From Colorado." In that motion, Mother requested that the court enter an order "allowing the permanent residence of the minor child to be changed from the State of Colorado to the State of Arizona and to modify previous parenting time orders to accommodate that change." Upon its own motion, the court appointed a special advocate and set a hearing for allocation of parental responsibility pursuant to subsection 14–10–124(1.5).

In its subsequent order allocating parental responsibilities, the court briefly discussed the relevant statutes, explaining the tension between the best interests statute, section 14–10–124, and the relocation statute, section 14–10–129, C.R.S. (2004). The court ultimately determined that it was required to allocate parenting time and decision-making responsibilities between the parties in accordance with subsection 14–10–124(1.5). However, the court held that even if subsection 14–10–129(2) applied, its holding would be the same.

Based on the testimony of Mother, Father and the special advocate, the court held that it was in Jordan's best interests for the parents to have joint decision-making authority. The court also determined that it was in Jordan's best interests to remain in Colorado, stating, "Jordan was born here and has spent the entire eleven months of her life to date here. Jordan is to remain a Colorado girl." Accordingly, the court ordered Mother to remain in Colorado:

> [Mother] has fifteen hours—one semester—left to graduate from Colorado State University. Should she choose to finish up and graduate the parties could still maintain their co-parenting schedule by living along the northern I–25 or Highway 287 corridors between Longmont and Fort

Collins. Such an arrangement would allow [Mother] to go to school in Ft. Collins and [Father] to work in Boulder County. Otherwise, [Mother] is to seek employment and housing in the Denver–Boulder metropolitan area.

The court also ordered the parties to develop their own parenting schedule with the help of a parenting coordinator. Mother appealed.

In *In re Responsibility of J.N.G.*, 2003 WL 21940954 *(Colo.App.2003), the court of appeals affirmed the trial court's order, holding that the trial court properly applied the best interests standard "to determine Mother's request to relocate with the child to the State of Arizona." The court of appeals did not address Mother's constitutional argument that the trial court violated her right to travel when it ordered her to remain in Colorado because Mother failed to raise the constitutional issue prior to entry of permanent orders.

We granted certiorari to determine whether a trial court may order a parent to live in a specific location when it determines the best interests of the child. We conclude that in an initial determination to allocate parental responsibilities, a court has no statutory authority to order a parent to live in a specific location.[1] Rather, the court must accept the location in which each party intends to live, and allocate parental responsibilities accordingly in the best interests of the child.

## II. Legal Analysis

■ To determine whether the trial court abused its discretion in allocating parental responsibilities, we engage in a two-part analysis. First, we must establish that the trial court applied the correct statute. We must then analyze whether the trial court's decision under the statute was manifestly unfair, arbitrary, or unreasonable so as to constitute an abuse of discretion. *See People v. Riggs*, 87 P.3d 109, 114 (Colo.2004). Here, though the trial court applied the correct statute to the facts of the case, its decision was manifestly unfair and unreasonable so as to constitute an abuse of discretion.

## A. Section 14–10–124, not Section 14–10–129, Applies in an Initial Determination to Allocate Parental Responsibilities

■ This case began as a proceeding to allocate parental responsibilities pursuant to subsection 14–10–124(1.5). However, the proceedings were complicated when, as a result of temporary orders prohibiting her from leaving the state with Jordan, Mother filed a motion to relocate pursuant to subsection 14–10–129(2)(c). Such relocation motions are only appropriate to modify parenting time after an initial proceeding to allocate parental responsibilities. Even if temporary orders allocating parental responsibilities have entered, as here, it is well established that such orders merely allocate parental responsibilities pending a hearing pursuant to subsection 14–10–124(1.5). *In re Marriage of Fickling*, 100 P.3d 571, 574 (Colo. App.2004); *In re Marriage of Lawson*, 44 Colo.App. 105, 107–08, 608 P.2d 378, 380 (1980). Accordingly, allocation of parental responsibilities pursuant to subsection 14–10–124(1.5) is separate and distinct from modification hearings pursuant to subsection 14–10–129(2)(c). *See In re Marriage of Fickling*, 100 P.3d at 574 (holding that only the entry of permanent parenting time orders in a dissolution proceeding grants parenting time rights, the revision of which would necessitate application of section 14–10–129); *In re Marriage of Lawson*, 44 Colo.App. at 107–08, 608 P.2d at 380 (holding that temporary order is not res judicata to a permanent order).

## B. Subsection 14–10–124(1.5) Does Not Authorize a Court to Order a Parent to Live in a Specific Location

■ Mother first contends that the trial court abused its discretion and exceeded its statutory authority when it ordered her to live in Colorado. We agree.

■ Interpretation of a statute is a question of law that we review de novo. *E.g.,*

---

1. Petitioner further argues that the court order is unconstitutional. Because we hold that the court had no statutory authority to order the

mother to live in Colorado, we do not reach the constitutional issue.

*United Airlines, Inc. v. Indus. Claim Appeals Office*, 993 P.2d 1152, 1157 (Colo.2000). In construing a statute, we strive to give effect to the intent of the legislature and adopt the statutory construction that best effectuates the purposes of legislative scheme, looking first to the plain language of the statute. *E.g., People v. Yascavage*, 101 P.3d 1090, 1093 (Colo.2004). Where the statutory language is clear and unambiguous, we do not resort to any further rules of statutory construction. *E.g., id.* at 1093. We construe a statute so as to give effect to every word, and we do not adopt a construction that renders any term superfluous. *See Cherry Hills Resort Dev. Co. v. City of Cherry Hills Vill.*, 790 P.2d 827, 830 (Colo.1990).

■ Here, subsection 14–10–124(1.5) instructs trial courts to determine the allocation of parental responsibilities, including parenting time, in accordance with the best interests of the child, giving "paramount consideration to the physical, mental, and emotional conditions and needs of the child." The allocation of parenting time is a matter within the sound discretion of the trial court, taking into consideration the child's best interests and the policy of maintaining the child's relationship with both parents. *In re Marriage of Fickling*, 100 P.3d at 574–75. Thus, the General Assembly's mandate is clear: allocate parenting time between the parents in a manner which is in the best interests of the child.

■ Nothing in the plain language of subsection 14–10–124(1.5)(a), however, authorizes a trial court to allocate parenting time by ordering a parent to live in a specific locale. To the contrary, one of the factors set forth in subsection 14–10–124(1.5)(a) requires the court to consider "[t]he *physical proximity* of the parties to each other as this relates to the practical considerations of parenting time." *See* § 14–10–124(1.5)(a)(VIII)(emphasis added). Hence, while the trial court has the authority to consider where the parents live with relation to each other for the purpose of allocating parenting time, this authority, by its plain language, does not extend so far as to allow a court to order a parent to live in a particular or specific location.

■ We will not create an addition to a statute that the plain language does not suggest or demand. *See e.g., Scoggins v. Unigard Ins. Co.*, 869 P.2d 202, 205 (Colo. 1994)("We will not judicially legislate by reading a statute to accomplish something the plain language does not suggest, warrant or mandate."). Here, the plain language of the statute limits the authority of the trial court to merely taking into account, in its best interests of the child analysis, the residences of the parents and their proximity to each other.

This conclusion is buttressed by a comparison of the parental responsibility statute with the relocation statute. Such a comparison demonstrates that the General Assembly did not intend to give courts the authority to order parents to live in particular or specific locations in initial allocation proceedings.

For example, subsection 14–10–124(1.5)(a) does not refer to the location of a parent, but rather speaks only in terms of the "physical proximity of the parties." Conversely, subsection 14–10–129(2)(c) specifically addresses post-dissolution parental relocation.

Likewise, subsection 14–10–124(1.5)(a) is much less rigorous than subsection 14–10–129(2)(c) in terms of the factors it requires trial courts to consider. Subsection 14–10–124(1.5)(a) sets forth eleven factors the trial court must consider before determining the best interests of the child. Subsection 14–10–129(2)(c) incorporates these eleven factors and sets forth nine additional factors for a court to consider before allowing a parent to relocate. § 14–10–129(2)(c); *see also In re Marriage of Ciesluk*, No. 04SC555, 113 P.3d 135, 140, 2005 WL 1322964 (Colo. June 6, 2005).

Finally, in subsection 14–10–124(1), the General Assembly merely "urges" parents to share the rights and responsibilities of child-rearing.[2] In contrast, in subsection 14–10–

---

2. "The general assembly finds and declares that it is in the best interest of all parties to encourage frequent and continuing contact between each parent and the minor children of the marriage

129(2), the General Assembly prohibits majority time parents from relocating, mandating that a court "shall not modify" a prior order concerning parenting time unless certain conditions are met.[3]

These linguistic differences between the statutes are a reflection of the fact that the interests and circumstances of the parties at the time the relationship fails are quite different from those existing at the time of subsequent modification proceedings. *See Baures v. Lewis,* 167 N.J. 91, 770 A.2d 214, 229 (2001)("A removal case is entirely different from an initial custody determination. When initial custody is decided, either by judicial ruling or by settlement, the ultimate judgment is squarely dependent on what is in the child's best interests.... Removal is quite different. In a removal case, the parents' interests take on importance. However, although the parties often do not seem to realize it, the conflict in a removal case is not purely between the parents' needs and desires. Rather, it is a conflict based on the extent to which those needs and desires can be viewed as intertwined with the child's interests." (citations omitted)); *Ford v. Ford,* 68 Conn.App. 173, 789 A.2d 1104, 1109 (2002)(holding that "postjudgement relocation matters differ and should be treated differently from relocation issues that arise at the time of dissolution").

For instance at the time of dissolution, the parties are on equal ground with respect to a determination of parental responsibilities. *Ford,* 789 A.2d at 1109. Neither has vested parenting rights or decision-making responsibilities subject to restriction by the court. *Id.* Rather, each party is as likely as the other to become the majority time parent based on a best interests analysis. Conversely, in post-dissolution modification proceedings, the parties are on unequal grounds with respect to

parental responsibilities. *Id.* One party has already been named the majority time parent and a court has already rendered judgment as to issues such as parenting time and decision-making responsibilities. *See id.* As a result, each parent has vested rights in a specified amount of parenting time and decision-making responsibility. Hence, a more stringent standard for relocation is necessary to protect the already vested rights of the parents.

Similarly, the child's circumstances during the initial allocation are different than they are at modification. In most modification cases, the child has achieved a degree of stability in the post-decree family unit that has not occurred at the time of dissolution proceedings. *See In re Marriage of Francis,* 919 P.2d 776, 780–81 (Colo.1996)("The [Uniform Dissolution of Marriage Act] recognizes and carries out the philosophy that assuring stability and finality in a child's custody is an important factor in the post-dissolution emotional health of a child."). This is because the interdependence and relationship between the majority time parent and the child that exist at the time of modification proceedings have presumably not yet formed at the time of dissolution. *See Ford,* 789 A.2d at 1109. As a result, as the statutory language indicates, the goal of dissolution proceedings is to create a stable situation between the new family units arising out of the divorce, whereas the goal of a modification proceeding is to maintain this stability, if possible, in the best interests of the child. *See* § 14–10–124; § 14–10–129.

In sum, since we will not read a statute to accomplish something the plain language does not suggest, we decline to find that a trial court has authority to order a parent to live in a specific place pursuant to subsection 14–10–124(1.5)(a).[4] Had the General Assem-

---

after the parents have separated or dissolved their marriage. In order to effectuate this goal, the general assembly *urges* parents to share the rights and responsibilities of child-rearing and to encourage the love, affection, and contact between the children and the parents." § 14–10–124(1)(emphasis added).

3. *See* § 14–10–129(2)(c).

4. Our resolution in this case has no impact on a trial court's authority to temporarily stabilize a situation or to preserve the status quo by issuing a temporary restraining order ordering a parent who has relocated without the court's knowledge to return to Colorado with the minor child. *See* § 14–13–210(2), C.R.S. (2004)("If a party to a child-custody proceeding whose presence is desired by the court is outside this state, the court may order that a notice given pursuant to section

bly wanted the trial courts to have the authority to dictate the domicile of the parents, then it would have instructed courts to engage in an analysis akin to that set forth in subsection 14–10–129(2)(c). Rather, in the initial determination of parental responsibilities, the plain language of subsection 14–10–124(1.5) indicates that a trial court must accept the location in which each party intends to live, and allocate parental responsibilities, including parenting time, accordingly. Consistent with this approach, we encourage parties awaiting the initial allocation of parental responsibilities to submit to the court their proposed plans to move, instead of moving before the initial allocation occurs.

Thus, the trial court should have allocated parenting time with the understanding that Mother was intending to live in Arizona and Father was intending to live in Colorado. Unlike some cases where the parents' future plans are ambiguous, in this case Mother testified that she wanted to live in Arizona, and that she wanted to do so in order to have the support of her family and to pursue better job opportunities. In addition, Mother premised her proposed parenting schedule on her desire to live in Arizona. Finally, there was no testimony that either parent was unfit or did not have the best interests of the child at heart. *See Troxel v. Granville,* 530 U.S. 57, 68–69, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)("So long as a parent adequately cares for his or her children (i.e. is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.")(citing *Reno v. Flores,* 507 U.S. 292, 304, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993)).

Therefore, the trial court should have fashioned a parenting plan which took into account the "physical proximity of the parties to each other"; specifically, that Mother would be living in Arizona and Father would be living in Colorado. In failing to do this, the trial court abused its discretion and ex-

ceeded its statutory authority. Accordingly, we reverse the court of appeals' holding and remand with instructions to return the case to the trial court for proceedings consistent with this opinion.

---

14–13–108 [C.R.S. (2004)] include a statement directing the party to appear in person with or without the child and informing the party that failure to appear may result in a decision adverse to the party."); § 14–13–210(3)("The court may

enter any orders necessary to ensure the safety of the child and of any person ordered to appear in this section.").

