24CA2107 Parental Resp Conc EMK 10-30-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA2107
City and County of Denver District Court No. 21DR2587
Honorable Marie Avery Moses, Judge

---

In re the Parental Responsibilities Concerning E.M.K., a Child,

and Concerning Jason Matthew Kidd,

Appellee,

and

Holly Joy Schlotterback,

Appellant.

---

ORDER AFFIRMED

Division II
Opinion by JUDGE MEIRINK
Fox and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 30, 2025

---

No Appearance for Appellee

Williams Weese Pepple & Ferguson PC, John Bernetich, Rena E. Meisler, Denver, Colorado, for Appellant

¶ 1      Holly Joy Schlotterback (mother) appeals the district court's order modifying decision-making authority and parenting time.  We affirm.

## I.      Background

¶ 2      Mother and Jason Matthew Kidd (father) share one child — E.M.K. — who was born in 2021.  After mediation, the parties reached a simplified parenting plan agreement in May 2022, which the district court adopted in its permanent orders.  The parenting plan provided for joint decision-making and allocated all overnights to mother but specified that father would have liberal parenting time, as agreed upon by the parties.

¶ 3      At mother's request, the district court modified the parenting plan in July 2023 and made, in relevant part, the following findings of fact:

- The parties had been in a state of almost constant conflict since the permanent orders were entered.

- The parties had been unable to agree upon a parenting time schedule for E.M.K.

- The relationship between the parties was marked by intense conflict and emotionality. The parents were dishonest with each other.

- On two occasions mother had sought and obtained temporary civil protection orders against father, but neither protection order was made permanent.

- Parenting time exchanges were periods of intense conflict between the parents and had to be minimized to protect E.M.K. from parental conflict.

- The parents' failure to provide the court with any information about E.M.K. demonstrated that neither parent was able to focus on E.M.K.'s needs, and the parents were only able to focus on their own wants and desires.

- For E.M.K. to develop strong bonds with father, E.M.K. needed increased parenting time with father.

The court allocated parenting time to father from Sunday at noon to Tuesday morning in week one and from Friday night to Tuesday morning in week two, with the schedule to repeat every two weeks. Mother was awarded all parenting time not allocated to father. The parties retained joint decision-making authority.

¶ 4    In October 2023, father filed a verified motion concerning parenting time disputes under section 14-10-129.5, C.R.S. 2025, alleging that mother had taken parenting time away from him and lied to him about E.M.K.'s schooling.  Father also filed a contempt motion, alleging, among other things, that mother refused to give him the child and was late for exchanges.

¶ 5    The district court scheduled a hearing and appointed a Child and Family Investigator (CFI).  The order appointing the CFI noted that there was "currently a protection order in [a] Denver County Case . . . wherein [father] is the restrained party and [mother] is the protected party."

¶ 6    The CFI completed a twenty-five-page report detailing the following:

- Father's record included an arrest in June 2023 for violating a protection order in which mother was the protected party.  The arrest involved domestic violence charges of disturbance via phone and making threats to injure a person or property.  He went to trial on the domestic violence charges and was found guilty of disturbance via phone but not guilty of making threats in

violation of a protection order because he was not served with the protection order before the incident.

- Father was arrested again in September 2023, in part, for violating a protection order.

- The parties had been conducting parenting time exchanges at the Denver Police Department (DPD) District 2 station because a mandatory protection order was issued between the parties shortly after the parenting plan was implemented.

- In September 2023, mother moved from Denver to Castle Rock because she had been on a waitlist for subsidized housing since 2017.

¶ 7 The district court held a hearing on father's motion in September 2024. At the request of mother's counsel, the court took judicial notice of the two criminal cases involving father. The court also advised father as follows:

> Now, one of the other factors that I have to consider is any reports related to domestic violence. Now, I understand that you have perhaps some criminal charges pending related to domestic violence, and it sounds like you might be appealing some of those. So you are welcome to tell me anything you want me

4

> to know about . . . domestic violence. On the
> other hand, you do have a Fifth Amendment
> right not to speak about any instances if it
> might incriminate you. I will — if you do
> invoke your Fifth Amendment right not to
> testify about any issues that might subject you
> to criminal penalties, I can . . . draw an
> adverse inference about your refusal to testify
> about those issues.

Father discussed his domestic violence conviction for "disturbance via phone," explaining that the charge stemmed from texts he sent to mother asking why she had checked E.M.K. out of day care when it was his "day" with E.M.K.

¶ 8    Father, mother, and the CFI testified at the hearing. Mother asked the court to keep the current parenting time schedule, and the CFI recommended a parenting schedule "similar to the one that is in place now." Mother also asked for sole decision-making authority; father asked the court to maintain joint decision-making. As part of her testimony, the CFI recommended that mother be responsible for decision-making.

¶ 9    After considering the CFI's report; the testimony of father, mother, and the CFI; and "all factors regarding the best interests of the minor child pursuant to [section] 14-10-124," C.R.S. 2025, the court modified the existing allocation of parenting time and

decision-making authority. The court ordered an equal parenting time schedule with only one exchange per week, to occur at the DPD District 2 station. The court awarded mother sole decision-making authority over religious activities; medical, dental, and mental health; and any extracurricular or recreational activities that occur during mother's parenting time. Father was given sole decision-making authority over school and education and any extracurricular or recreational activities that occur during his parenting time. Mother appeals.

## II. Analysis

¶ 10 Mother contends that the district court failed to consider evidence of domestic violence by father against her before awarding father equal parenting time and giving him sole decision-making authority over certain matters in violation of section 14-10-124(4)(a), (1.5)(a), and (1.5)(b). We disagree.

### A. Standard of Review and Applicable Law

¶ 11 We review a court's modification of parenting time and parental responsibilities for an abuse of discretion. *In re Marriage of Barker*, 251 P.3d 591, 592 (Colo. App. 2010); *Spahmer v. Gullette*, 113 P.3d 158, 161 (Colo. 2005). The district court abuses its

discretion when it acts in a manner that is manifestly arbitrary, unfair, or unreasonable or when it misapplies or misconstrues the law. *In re Marriage of Fabos*, 2022 COA 66, ¶ 16.

¶ 12 When there is support in the record for the findings, the district court's "resolution of conflicting evidence is binding on review." *In re Parental Responsibilities Concerning B.R.D.*, 2012 COA 63, ¶ 15. We review de novo whether the district court applied the correct legal standard. *In re Marriage of Crouch*, 2021 COA 3, ¶ 21.

¶ 13 The district court may modify an order regarding parenting time whenever the modification would serve the best interests of the child. § 14-10-129(1)(a)(I), C.R.S. 2025. The district court "has broad discretion" to modify parenting time, "taking into consideration the child's best interests and the policy of encouraging parent-child relationships." *Barker*, 251 P.3d at 592. What serves the bests interests of the child is determined by considering the factors in section 14-10-124(1.5). *In re Marriage of Stewart*, 43 P.3d 740, 741–42 (Colo. App. 2002).

¶ 14 Likewise, a court may modify an order of decision-making responsibility if it finds that "a change has occurred in the circumstances of the child" or the parent with decision-making

authority, and "the modification is necessary to serve the best interests of the child." § 14-10-131(2), C.R.S. 2025. The court must retain the existing allocation of decision-making responsibility unless doing so "would endanger the child's physical health or significantly impairs the child's emotional development and the harm likely to be caused by a change of environment is outweighed by the advantage" to the child. § 14-10-131(2)(c). In determining the best interests of the child for decision-making authority, the court gives "paramount consideration to the physical, mental, and emotional conditions and needs of the children, after considering numerous statutory factors." *In re Marriage of Bertsch*, 97 P.3d 219, 222 (Colo. App. 2004).

¶ 15    When a claim of domestic violence is made to the court, "prior to allocating parental responsibilities . . . and prior to considering the factors set forth in paragraphs (a) and (b) of subsection (1.5) . . . the court shall consider" whether a party has committed domestic violence, including a party's pattern or history of domestic violence. § 14-10-124(4)(a)(II). While the court must consider the factors set forth in the statute as it applies to the best interests of the child, the court does not need to make specific findings on every factor if

the record reflects that the court considered the "pertinent factors." *People in the Interest of A.M.K.*, 68 P.3d 563, 565–66 (Colo. App. 2003). The district court's "[f]indings must be sufficiently explicit, however, to give the reviewing court a clear understanding of the basis of the order." *In re Marriage of Pawelec*, 2024 COA 107, ¶ 44.

### B. The District Court Considered Evidence of Domestic Violence as Required by Section 14-10-124(4)(a)

¶ 16   Mother alleges that the district court failed to comply with the requirements of section 14-10-124(4)(a), by not determining whether father committed domestic violence. We disagree.

¶ 17   Mother argues that the record fails to show the court considered the allegations of domestic violence. Our review of the record indicates otherwise. During the hearing, the court took judicial notice of father's criminal cases, including the case in which he was convicted of disturbance via phone. The court also asked father about the domestic violence allegations, his pending charges related to domestic violence, and how he intended to address his low frustration tolerance.

¶ 18   The court's order similarly reflects its consideration of domestic violence by acknowledging father's "low frustration

tolerance," his "inability to manage his negative feelings towards mother," and the CFI's findings that father "engaged in coercive control in his dealings with mother." The order also addressed father's treatment of mother and specified the findings in the CFI's report outlining the same history. Accordingly, there is ample evidence in the record that the district court considered the allegations of domestic violence in its analysis.

¶ 19 Mother contends that the court erred by not determining, as a threshold matter, whether father committed domestic violence. The statute, however, does not require the court to make such a finding. Rather, the district court must only consider whether one of the parties has committed domestic violence. § 14-10-124(4)(a)(II). The court therefore did not misconstrue or misapply the law; it properly considered the allegations and evidence of domestic violence during the hearing and in its order.

C. The District Court Did Not Err in Allocating Parenting Time

¶ 20 Mother alleges that the district court did not comply with the provisions of section 14-10-124(1.5)(a) and failed to consider evidence of domestic violence when it allocated parenting time. Specifically, she argues that the district court ignored the evidence

10

of domestic violence mentioned in the CFI's report, which included information on father's prior arrests and displays of coercive behavior. She claims that the court erred by departing from the CFI's recommendation to maintain a parenting time schedule like the one currently in place. We disagree.

¶ 21    Under section 14-10-124(1.5)(a), the court may make "provisions for parenting time that the court finds are in the best interests of the child, with the child's safety always paramount." This standard requires the court to consider factors including, but not limited to, interactions between the child and their parents and siblings, the child's adjustment to the home, the ability of the parties to encourage the sharing of love and affection between the child and the other party, and the ability of the parties to place the child's needs ahead of their own. § 14-10-124(1.5)(a)(III), (IV), (VI), (XI).

¶ 22    In addition, section 14-10-124(1.5)(a)(III.5) provides that when determining the best interests of the child, the court shall consider CFI reports related to domestic violence. While the statute requires the court to consider the CFI's report, the court is not required to

follow the CFI's recommendations.  *See In re Marriage of McNamara*, 962 P.2d 330, 334 (Colo. App. 1998).

¶ 23    The court's order reflects its consideration of the CFI's report and the CFI's testimony as well as the other statutory factors it must consider when allocating parenting time between mother and father.

¶ 24    The court agreed with the CFI's assessment that the parenting exchange times between mother and father led to increased conflict, encouraged inappropriate behavior between the parties, and should be modified to protect E.M.K. from parental conflict.  The CFI report noted that father used the exchanges as an opportunity to address "adult issues" with mother in front of E.M.K.  Additionally, the report indicated that the parenting time exchanges resulted in father expressing anger towards mother, with father being arrested at one exchange.

¶ 25    The report further acknowledged that the 6:30 a.m. exchanges were too early for E.M.K., as she often sleeps later than the exchange time.  To address the issue, the court's order implements parenting exchanges in the afternoon rather than in the mornings.  Similarly, the court's order minimized the exchanges to once a

week, in response to the CFI's assessment that these exchanges are times of intense conflict.

¶ 26 In addition to considering the CFI's report, the court's order reflects a consideration of the pertinent factors, including the ability of the parties to encourage the sharing of love and affection between the child and the other party. The court found that father encourages the relationship between E.M.K. and mother, while the court disagreed that mother was willing to foster E.M.K.'s relationship with father. Additionally, the order indicates the court looked at the ability of the parties to place the child's needs above their own. The court noted that mother's decision to move to Castle Rock, her interactions with father, and her decision to exclude father from participating in communications with E.M.K.'s day care were not based on E.M.K.'s needs.

¶ 27 As to father's increased time with E.M.K., the court determined that there's no reason to believe E.M.K. is not ready to transition to equal parenting time "particularly if it results in fewer parenting time transitions between the parties." The CFI's report supports this finding, stating that, during her visit, E.M.K. was playful, happy, and comfortable in father's home. The CFI's report

further provides that father was attentive to E.M.K. during the visit and the two share a strong bond.

¶ 28 The court's parenting time order, while different from the CFI's recommendations, ultimately reflects the court's consideration of what the CFI indicated as the source of conflict between the parties, which was the parenting time exchanges. Because the court's order considers the factors required by section 14-10-124(1.5)(a), including reports of domestic violence, the court did not abuse its discretion in allocating parenting time.

¶ 29 Finally, mother argues that the court erred by failing to make an oral or written finding explaining why unsupervised parenting time with father was in the best interests of the child when there are allegations of domestic violence as required by section 14-10-124(9).

¶ 30 Even if mother were correct, however, the lack of written or oral findings specific to unsupervised parenting time for father is harmless because it does not affect the fairness of the proceedings for several reasons. *See Pawelec*, ¶ 56. Since the permanent orders were entered, father has never had supervised parenting time, mother never requested that father's time be supervised, and

14

mother told the CFI she wanted to continue the parenting schedule in effect, which provided for unsupervised parenting time with father. Further, the CFI never mentioned father's parenting time should be supervised, and there is ample evidence in the record, including the CFI's report and CFI's testimony, that father and E.M.K. have a loving relationship.

### D. The District Court Did Not Err in Allocating Decision-Making Responsibility

¶ 31 Mother contends that the district court did not comply with the statutory requirements of section 14-10-124(1.5)(b) in allocating decision-making responsibilities. Specifically, mother argues that the court erred by not considering evidence of domestic violence and did not consider as the primary concern the safety and well-being of E.M.K. and mother. We disagree.

¶ 32 The best interests of the child analysis for allocation of parental responsibilities requires the court to consider the factors in subsection (1.5)(a) as well as (I) evidence of the ability of the parties to cooperate and make joint decisions; (II) the involvement of the parties with the child in a manner that "reflects a system of values, time commitment, and mutual support that would indicate" the

ability for the parties as mutual decision-makers to provide a nourishing and positive relationship with the child; (III) and whether mutual decision-making will promote continuing contact between the parties and the child. § 14-10-124(1.5)(b).

¶ 33 As pertinent here, the court's order regarding decision-making authority states that "[t]he parties are unable to share joint decision-making authority because of their intense conflict." This intense conflict has been present throughout the case. As it pertains to the relationship between the parties, the court stated:

> The parents are dishonest with each other. Both parents are extremely rigid in their dealings with each other. In their efforts to communicate, both parents are only able to see their own perspective and consider their own needs. The parents are unable to consider the perspective of the other parent and are unable to be flexible to accommodate the child's needs.

¶ 34 Additionally, father testified that he and mother were unable to cooperatively make decisions. When the court asked father if he could point to any instances where the parties effectively made a decision together, father stated that nothing came to mind. The CFI's statements reiterate father's testimony. When asked why the CFI was recommending sole decision-making for mother, the CFI

testified that she did not "come across a lot of evidence that these parties would be able to consistently work together, communicate appropriately, and be able to make decisions."

¶ 35    Based on the parties' past, the district court determined that allocating sole decision-making to mother in all contexts would not be in E.M.K.'s best interests.  The court was "gravely concerned that mother would use an award of sole decision-making responsibility to attempt to exclude father from the child's life."  With respect to E.M.K.'s school and education, the court was concerned that mother would use her decision-making authority "to enroll the child in a school that would make it impossible for father to exercise significant parenting time because of his work schedule."  The court determined that this would not be in the child's best interest.  Father noted such concerns in his testimony.  He testified that he was not involved in the process of selecting E.M.K.'s day care and that mother had unilaterally completed the admissions paperwork.  Father also testified that he tried to participate in parent-teacher conferences but was told that parents had to meet together.  Father subsequently learned that mother met privately with one of E.M.K.'s teachers.  When the court asked mother if she considered staying

home and allowing father to attend a parent-teacher conference, mother indicated she could have but that she did not.

¶ 36　Given the record of intense and constant conflict between the parties and their inability to cooperatively make decisions, the court's allocation of decision-making authority was not an abuse of discretion.

¶ 37　Finally, mother argues that section 14-10-124(4)(d) required the court to consider, as the primary concern, the safety and well-being of the child and mother. While the court did not make a finding of domestic violence, the record indicates the court did consider and implement mechanisms to ensure the safety and well-being of mother and E.M.K. The court's order limits the amount and method of contact between the parties to two messages per day on TalkingParents, it requires parenting time exchanges to occur at the DPD District 2 station, and it requires father to enroll in six months of anger management treatment. These provisions address the difficulties in communication and exchanges between the parties by limiting interactions, ensuring interactions are in monitored locations, and addressing father's low frustration tolerance and anger towards mother. The court therefore

considered the best interests of E.M.K. while implementing measures to ensure the safety of mother and E.M.K.

### III. Disposition

¶ 38 We affirm the district court's order.

JUDGE FOX and JUDGE BROWN concur.