25CA0643 Marriage of Gawlik 05-21-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0643
Douglas County District Court No. 23DR30129
Honorable Andrew Baum, Judge

---

In re the Marriage of

David Gawlik,

Appellant,

and

Courtney Payne,

Appellee.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE TOW
Harris and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 21, 2026

---

The Harris Law Firm, PLLP, Katherine O. Ellis, Denver, Colorado, for Appellant

Hulse Law Firm, PC, Claira A. Rolfson, Littleton, Colorado, for Appellee

¶ 1     In this dissolution of marriage case involving David Gawlik (father) and Courtney Payne (mother), father appeals the district court's permanent orders regarding the allocation of parental responsibilities, the calculation of his income, and retroactive maintenance and child support.  We affirm.

## I.     Background

¶ 2     After approximately three and a half years of marriage, father filed a petition for dissolution.  The parties entered into a stipulated temporary order that allocated parenting time and decision-making responsibility for their two children.  Under this agreement, mother retained majority parenting time while father exercised regular overnights with their then-two-year-old son and day visits with their then-five-month-old daughter.  A few months later, mother notified the court and father of her intent to relocate to Florida.

¶ 3     Following a permanent orders hearing to address the allocation of parental responsibilities, child support, and maintenance, the district court issued two written orders.  The first order allocated mother majority parenting time and authorized the children to move with her to Florida.  The second order required father to pay ongoing child support, retroactive child support, and

1

retroactive temporary maintenance after it calculated that father's gross monthly income (GMI) was $20,000.

¶ 4     Father filed a motion for post-trial relief pursuant to C.R.C.P. 59. Father requested the court "reconsider its findings and orders regarding the parties' incomes and the resulting maintenance order, including the orders regarding retroactive support." The court denied this motion after finding that father was merely restating arguments that he had made at the hearing and that the court had already rejected in its permanent orders.

## II.     Parental Responsibilities

¶ 5     Father argues that the district court erred when it issued parenting time orders that allowed the minor children to reside in Florida. We disagree.

### A.     Standard of Review and Applicable Law

¶ 6     We review a district court's allocation of parental responsibilities for an abuse of discretion. *In re Marriage of Collins*, 2023 COA 116M, ¶ 8. A court abuses its discretion if it misapplies the law or its decision is manifestly arbitrary, unreasonable, or unfair. *Id.* "The district court has broad discretion over the allocation of parenting time, and we exercise every presumption in

2

favor of upholding its decision." *Id.* "When a [district] court's order is supported by competent evidence, it should not be disturbed on review." *In re Marriage of Hatton*, 160 P.3d 326, 330 (Colo. App. 2007).

¶ 7 The district court allocates parenting time based on the child's best interests as determined by applying the factors enumerated in section 14-10-124(1.5)(a), C.R.S. 2025. *See In re Marriage of Fickling*, 100 P.3d 571, 575 (Colo. App. 2004). And "in the initial determination of parental responsibilities, the plain language of []section 14-10-124(1.5) indicates that a [district] court must accept the location in which each party intends to live, and allocate parental responsibilities, including parenting time, accordingly." *Spahmer v. Gullette*, 113 P.3d 158, 164 (Colo. 2005).

## B.     Additional Background

¶ 8 The court appointed a child and family investigator (CFI) to make recommendations regarding the allocation of parenting time and to address the proposed relocation. In a written report, the CFI opined that "[m]other is a fit and proper parent and there are no concerns about her ability to take care for and provide for the children." The CFI also observed that "[f]ather's strengths [include]

being involved in the children's lives," but that he "lack[ed] child development knowledge," had a "superior attitude towards [m]other," and showed a "hesitancy to get involved with [daughter]." The CFI recommended that mother remain the majority parent and that the children relocate with her to Florida.

¶ 9    The court appointed a parental responsibilities evaluator (PRE) on father's motion. In a written report, the PRE noted that while mother "is an excellent primary caregiver, and the children are bonded affectionately and strongly to her," she also presented with some concerning behaviors including "personality disorder traits," "significant episodic anxiety," and "ang[ry] and erratic behavior." Regarding father, the PRE reported that the children "are strongly and affectionately bonded to him" and "[b]oth children look up to [father] and desire ongoing and frequent contact with him," but that father's weaknesses include a "lack of emotional availability" and certain "personality problems." The PRE presented a parenting time plan wherein mother, father, and the children all remained in Colorado. The PRE did not offer an alternative parenting plan that accounted for mother living in Florida and, in fact, testified that the

court should require both parties to remain in the state —
notwithstanding the fact that the court could not legally do so.

¶ 10     In an oral ruling, the district court noted that it "generally
agree[d] and adopted the CFI's findings" and "agree[d] . . . in part
[with] the PRE."  The court also suggested that while mother's move
to Florida was what was best for her, the court "[did not] necessarily
agree that it is the best option for these children."  Nevertheless, the
court acknowledged that, under *Spahmer*, it had to "fashion a
parenting plan . . . where [mother] lives in Florida and [father] lives
in Colorado."  The court concluded that it was in the best interests
of the children that mother be the majority parent and, thus, "when
she goes to Florida, the children will go to Florida."  The court
issued a written order reflecting its findings.

## C.    Analysis

¶ 11     Father argues that the district court abused its discretion
when it created a parenting plan that allowed the children to move
to Florida "because it was entered after finding that the order was
not the best option for the children and therefore, was manifestly
unfair, arbitrary, or unreasonable."  We disagree.

¶ 12    First, we note that father's argument ignores the impact of *Spahmer*. As noted, that case makes clear that the court "must accept the location in which each party intends to live, and allocate parental responsibilities, including parenting time, accordingly." *Spahmer*, 113 P.3d at 164. Thus, notwithstanding the district court's apparent opinion that the children would be better served if mother stayed in Colorado, it could not require her to do so. Thus, the court's correct application of *Spahmer* required it to determine the best interests of the children with mother in Florida and father in Colorado.

¶ 13    The court then explicitly considered each statutory best interests factor, *see* § 14-10-124(1.5)(a), in light of the unavoidable reality of where the parties would live. And it explained which portions of the CFI and PRE reports it relied on when doing so. The court ultimately concluded that "given [that mother] has been a primary caregiver for both children, and she is a very good caregiver, [it] is in the . . . best interests of both of these children that she remain the primary parent which means, when she goes to Florida, the children will go to Florida."

¶ 14    Notably, father does not argue that the district court's best interests findings were incorrect. Instead, he simply asserts that the court's comment that the children were not necessarily being best served by mother's move to Florida was enough to make the court's parenting time allocation an abuse of discretion. But parenting disputes involving relocation often "present agonizing decisions for [the district] court." *In re Marriage of Ciesluk*, 113 P.3d 135, 147 (Colo. 2005). And after considering the reports, testimony, and other evidence before it, the court found that the best interests factors weighed in favor of allocating mother majority parenting time. Because there is record support for this decision, we will not disturb it on appeal. *See Collins*, ¶ 8.

¶ 15    Father additionally contends that the district court erred by unreasonably relying on the CFI's findings instead of the PRE's "because the CFI's investigation was less extensive and in depth, did not consider [f]ather's work with the parenting coach, and was concluded more than a year before the permanent orders hearing." But "the probative effect and weight to be given to the evidence are matters within the province of the [district] court." *In re Marriage of Blake*, 807 P.2d 1211, 1213 (Colo. App. 1990). Thus, we will not

7

disturb the court's decision to rely more heavily on one report over the other.

¶ 16    Finally, father argues the district court erred when it found that "'gatekeeping' is not a psychologically or psychiatrically valid concept." Initially, we note that the court found the term "parental alienation" — not "gatekeeping" — to be scientifically invalid. Indeed, the court expressly considered the PRE's examples of gatekeeping behavior from mother. It found that "many of the examples the PRE cited as . . . 'gatekeeping' were actually [m]other just stating her position in the normal course of a highly-contested domestic relations case," and that other "examples in the PRE report were gatekeeping, but they were facilitative gatekeeping." The court then went on to highlight three acts by mother that did not "support[] a continuing involvement and maintenance of a relationship between [father] and the child[ren]."

¶ 17    Regardless of whether — given the absence of any evidence on the subject presented at the hearing — the district court erred in its observations regarding the scientific invalidity of the concept of "parental alienation," it considered the PRE's examples of mother's gatekeeping behavior when issuing its order. And we may not

reweigh the same evidence and substitute our judgment for that of the district court. *See In re Marriage of Nelson*, 2012 COA 205, ¶ 35.

¶ 18 The district court did not abuse its discretion by allocating mother majority parenting time and allowing the children to relocate to Florida.

### III. Income Calculations

¶ 19 Father argues the district court erred when it calculated his income. Again, we disagree.

### A. Standard of Review and Applicable Law

¶ 20 We review child support orders for an abuse of discretion. *In re Marriage of Garrett*, 2018 COA 154, ¶ 8. And we defer to the district court's factual findings regarding a party's income so long as they are supported by the record. *In re Marriage of Connerton*, 260 P.3d 62, 66 (Colo. App. 2010).

¶ 21 To determine the amount of a child support award, the court must consider several factors, including both parents' financial resources. § 14-10-115(2)(b), C.R.S. 2025. For the purposes of child support, "'[i]ncome' means the actual gross income of a parent, if employed to full capacity." § 14-10-115(3)(c). And if a

party is self-employed, "'gross income' equals gross receipts minus ordinary and necessary expenses . . . required to produce such income." § 14-10-115(5)(a)(III)(A).

### B.    Additional Background

¶ 22    During the dissolution proceedings, father transitioned from being an employee of a company to being a self-employed business owner.  At the permanent orders hearing, father presented his bank statements and a summary of his income calculation based on those statements.  Each month showed transfers from father's business account to his personal account.  Father also received a $20,000 mobile deposit that he did not address during his testimony.  Father testified that his GMI was $8,147, which he calculated by "look[ing] at every single transaction from [his] business account, every invoice, and then every expense."  However, mother testified that father's GMI was $20,000.

¶ 23    The court found that father's GMI was $20,000.  The court calculated this amount after stating that it did not find father's summary of his annual income credible.  Instead, the court found "the more accurate and reliable evidence of [f]ather's GMI comes from transfers of money from the business checking account to his

personal account." The court concluded that "[f]ather's income is the average of the amount of monthly deposits into his personal account from his business account."

### C. Analysis

¶ 24    Father argues that the district court erred when it calculated his GMI by averaging all monthly deposits from his business account to his personal account and that the court should have accepted his proposed GMI of $8,147.

¶ 25    The district court was entitled to reject father's proposed GMI based on his bank statements and testimony. *See Blake*, 807 P.2d at 1213; *see also In re Marriage of Bowles*, 916 P.2d 615, 617 (Colo. App. 1995) (The district court "as a finder of fact can believe all, part, or none of a witness'[s] testimony."). Furthermore, while father argues that the "[t]ransfers from one account to another could reflect depletion of an asset [or] could be funds acquired via loan," he did not offer evidence that his transfers fell into one of these — or any other such — categories. When "there is a substantial fluctuation in a parent's income . . . the [district] court has discretion to consider, or use an average of, past earnings." *In re Marriage of Rice*, 987 P.2d 947, 950 (Colo. App. 1999). The court

11

exercised this discretion when it averaged father's transfers from his business account to his personal account to calculate his GMI. We will not disturb the district court's finding that father's GMI was $20,000. *See Connerton*, 260 P.3d at 66.

## IV. Retroactive Maintenance and Child Support

¶ 26 Father argues the district court erred when it ordered him to pay retroactive child support and maintenance. We disagree.

### A. Standard of Review and Applicable Law

¶ 27 We review maintenance awards and child support orders for an abuse of discretion. *In re Marriage of Tooker*, 2019 COA 83, ¶ 12 (maintenance); *Garrett*, ¶ 8 (child support).

¶ 28 To award maintenance, the court must first determine whether the requesting party is entitled to it based on certain statutory factors, including the parties' gross incomes, the marital property apportioned to each party, and the financial resources of each party. § 14-10-114(3)(a)(I), C.R.S. 2025. If the court determines the party is entitled to maintenance, it must consider additional factors that may affect the amount and term of the maintenance. § 14-10-114(3)(c). The maintenance guidelines state that a court "may award a monthly amount of temporary

maintenance." § 14-10-114(4). And while the statute is silent as to specifically awarding retroactive temporary maintenance, "[g]iven the district court's discretion over the term for an award of temporary maintenance, we cannot conclude that the court lacked the authority to order retroactive temporary maintenance." *In re Marriage of Herold*, 2021 COA 16, ¶ 15.

¶ 29 The child support statute, on the other hand, explicitly authorizes district courts to order retroactive child support. Specifically, it provides that the court "may order an amount [of child support] determined to be reasonable under the circumstances for a time period that occurred after the date of the parties' physical separation." § 14-10-115(2).

## B. Additional Background

¶ 30 Based on father's calculated GMI of $20,000, and other relevant factors, the court concluded that mother was not entitled to maintenance going forward but that she was entitled to retroactive temporary maintenance. The court ordered father to pay retroactive temporary maintenance in the amount of $37,588. And after considering the relevant factors for child support, the court ordered father to pay $1,669 in ongoing monthly child support. The

court also ordered father to pay retroactive child support in the amount of $18,851.[1]

### C.  Analysis

¶ 31    Father argues the district court erred when it calculated retroactive support without making sufficient findings and based on its incorrect calculation of father's GMI.

¶ 32    Initially, father argues that the district court's "findings as to [f]ather's income between February 2023 and December 2024 undermines its own findings that [f]ather earned $20,000 per month at the time of permanent orders."  First, the court explicitly noted in its written order that father "was earning an average of $20,000 starting in December 2023," which does not contradict its finding that he was earning that amount at the time of permanent orders.  Second, prior to December 2023, father's income changed over the course of these proceedings when he transitioned from being an employee to being a self-employed business owner.  The court acknowledged this change in employment in its calculations

---

[1] In calculating the retroactive child support, the district court appropriately accounted for the temporary maintenance it had determined father owed mother.

14

and issued different child support worksheets for different time periods that reflected the change in father's income.

¶ 33    Next, father argues that his "payments for the mortgage on the property where [mother] was staying should have been considered as a form of maintenance payment during that time and should have offset the retroactive maintenance the Court ordered." But at the permanent orders hearing, father testified to making only a single mortgage payment before the permanent orders hearing — for September 2024.[2] Notably, the court ordered father to pay temporary maintenance through August 2024. We cannot discern how father's payment of the mortgage in September should offset the temporary maintenance he owes for a prior period. Thus, we cannot say the district court abused its discretion by not adjusting the retroactive temporary maintenance award based on father's payment of the mortgage.

---

[2] After the hearing, father attempted to supplement the information regarding the expenses he had paid to keep the marital home out of foreclosure, but the district court correctly declined to consider evidence not provided at the hearing. For the same reason, we also decline to consider it.

¶ 34   Father similarly argues that his payments for childcare expenses should have been credited in the calculation for retroactive support. The court did account for childcare payments in the order and child support worksheets.

¶ 35   Father next argues that mother presented no evidence that she or the children needed additional support during the pendency of the proceedings. Father's contention is unfounded. Mother testified that she was unemployed for approximately six months during the proceedings. Mother also testified that she asked father to consider selling the marital home because she was struggling to keep up with the mortgage and bills associated with the property.

¶ 36   Next, relying on *Santilli v. Santilli*, 453 P.2d 606 (Colo. 1969), father argues that the district court's award of retroactive child support improperly impoverished him because it "effectively appropriated [father's] entire half of the marital estate." In *Santilli*, the Colorado Supreme Court found that the district court's orders for maintenance and child support would improperly impoverish the husband because he would have "less than $200 a month for himself." *Id.* at 609. Here, father's total monthly payment (including retroactive maintenance, retroactive child support, and

16

current child support) is \$3,229.[3]  And as discussed, *supra* Part III.B, the district court found that father's GMI was \$20,000.  Thus, father's total monthly payment for child support and maintenance accounts for only sixteen percent of his monthly income and still leaves him with a monthly income that exceeds mother's by nearly \$10,000.

¶ 37    Finally, father points to various portions of his testimony, mother's testimony, and the parties' sworn financial statements to support his contention that the district court's findings were insufficient to award retroactive maintenance and child support. Once again, the credibility of witnesses and weight to be given to evidence are matters within the province of the district court. *Blake*, 807 P.2d at 1213.  The court properly considered the testimony of both parents and the other evidence before it.  It then weighed that evidence and calculated a retroactive child support and maintenance plan to fit the circumstances.  In light of the court's factual findings, which have record support, we cannot say

---

[3] This monthly payment will be reduced to \$1,669 upon payment in full of the retroactive child support and retroactive temporary maintenance.

it abused its discretion by awarding retroactive child support and retroactive temporary maintenance.

## V. Disposition

¶ 38 The judgment is affirmed.

JUDGE HARRIS and JUDGE BROWN concur.