In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-2682

MAURICE A. JACKSON,

*Plaintiff-Appellant,*

*v.*

RASHONDA POLLION, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 09-cv-688 — **J. Phil Gilbert**, *Judge.*

ARGUED OCTOBER 8, 2013 — DECIDED OCTOBER 28, 2013

Before BAUER, POSNER, and EASTERBROOK, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiff, an inmate of an Illinois prison, has sued, under 42 U.S.C. § 1983—the ubiquitous federal constitutional tort statute—a nurse practitioner and a correctional counselor both of whom work at the prison. He accuses them of having been deliberately indifferent to his serious medical condition—hypertension (high blood pressure)—for which he was not receiving his prescribed medication. They thus were guilty, he charges, of inflicting

cruel and unusual punishment on him. The district judge granted summary judgment in favor of the defendants and dismissed the suit. The judge's ground, so clearly correct as not to require elaboration by us, is that neither defendant was deliberately indifferent to the plaintiff's condition: the nurse practitioner didn't know the plaintiff wasn't receiving his medication and the correctional counselor, who is not a member of the prison's medical staff, though he knew about the plaintiff's problem assumed the medical staff would deal with it. In failing to ascertain whether the medical staff was dealing effectively with the problem, the correctional counselor was at worst negligent, rather than deliberately indifferent (that is, reckless—knowing there was a serious risk unless he acted, yet failing to act; see *Farmer v. Brennan*, 511 U.S. 825, 836–37 (1994)).

What is troubling about the case is not its disposition but that both the district judge, and the magistrate judge whose recommendation to grant summary judgment the district judge accepted, believed that Jackson "can present evidence permitting a reasonable inference" that he had experienced a serious medical condition as a consequence of the interruption of his medication. This is mistaken, and (not surprisingly) has no support in the record. But it is not only repeated in the plaintiff's brief in this court, as one would expect; it is largely ignored by the defendants.

This lapse is worth noting because it is indicative of a widespread, and increasingly troublesome, discomfort among lawyers and judges confronted by a scientific or other technological issue. "As a general matter, lawyers and science don't mix." Peter Lee, "Patent Law and the Two Cultures," 120 *Yale L.J.* 2, 4 (2010); see also *Association for Molecu-*

*lar Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2120 (2013) (Scalia, J., concurring in part and concurring in the judgment) ("I join the judgment of the Court, and all of its opinion except Part I–A and some portions of the rest of the opinion going into fine details of molecular biology. I am unable to affirm those details on my own knowledge or even my own belief"); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 599 (1993) (Rehnquist, C.J., concurring in part and dissenting in part) ("the various briefs filed in this case … deal with definitions of scientific knowledge, scientific method, scientific validity, and peer review—in short, matters far afield from the expertise of judges"); *Marconi Wireless Telegraph Co. of America v. United States*, 320 U.S. 1, 60–61 (1943) (Frankfurter, J., dissenting in part) ("it is an old observation that the training of Anglo-American judges ill fits them to discharge the duties cast upon them by patent legislation"); *Parke-Davis & Co. v. H.K. Mulford Co.*, 189 F. 95, 115 (S.D.N.Y. 1911) (Hand, J.) ("I cannot stop without calling attention to the extraordinary condition of the law which makes it possible for a man without any knowledge of even the rudiments of chemistry to pass upon such questions as these. … How long we shall continue to blunder along without the aid of unpartisan and authoritative scientific assistance in the administration of justice, no one knows; but all fair persons not conventionalized by provincial legal habits of mind ought, I should think, unite to effect some such advance"); Henry J. Friendly, *Federal Jurisdiction: A General View* 157 (1973) ("I am unable to perceive why we should not insist on the same level of scientific understanding on the patent bench that clients demand of the patent bar, or why lack of such understanding by the judge should be deemed a precious asset"); David L. Faigman, *Legal Alchemy: The Use*

*and Misuse of Science in Law* xi (1999) ("the average lawyer is not merely ignorant of science, he or she has an affirmative aversion to it").

The discomfort of the legal profession, including the judiciary, with science and technology is not a new phenomenon. Innumerable are the lawyers who explain that they picked law over a technical field because they have a "math block"—"law students as a group, seem peculiarly averse to math and science." David L. Faigman, et al., *Modern Scientific Evidence: Standards, Statistics, and Research Methods* v (2008 student ed.). But it's increasingly concerning, because of the extraordinary rate of scientific and other technological advances that figure increasingly in litigation.

In 2007 the plaintiff, who was then 22 years old and serving a 40-year sentence for first-degree murder, was diagnosed with hypertension. The drugs hydrochlorothiazide (25 mg—a low dose) and amlodipine (5 mg—a normal dose) were prescribed. Later verapamil (180 mg) was substituted for the amlodipine. (Those two drugs are calcium channel blockers; hydrochlorothiazide is a diuretic.) The plaintiff claims not to have been given the drugs for a three-week period beginning on February 15, 2009 (we'll assume for purposes of this appeal that this is true), and that as a result he suffered loss of vision, nose bleeds, headaches, and light-headedness upon standing up (actually a symptom of low blood pressure, see Cleveland Clinic, "Orthostatic Hypotension," http://my.clevelandclinic.org/disorders/orthostatic_hypotension/hic_orthostatic_hypotension.aspx (all websites cited in this opinion were visited on Oct. 18, 2013).

The plaintiff's blood pressure had been taken on February 9, six days before his medication was interrupted. The

reading on that occasion was 112/82 (the top number is the systolic pressure, the lower the diastolic). His blood pressure was taken next on March 9, at the end of the period of interruption, and was 142/78. "Ideal" blood pressure is considered to be below 120/80, but the top of the normal range is 140/90. The systolic pressure was thus slightly above the normal range. A single reading has little significance, because blood pressure fluctuates even when the patient is taking his medication. A week after the plaintiff resumed his medication, his blood pressure was taken again, and this time it was 114/72.

Unless our plaintiff has some serious medical condition unmentioned in the briefs or record, the slight elevation above the normal range that he may have experienced during a three-week period (we cannot say, on the basis of a single reading, that he did experience it) would not have produced the symptoms of which he complains or have endangered his long-term health. "The *prolonged* elevation of either the systolic or the diastolic blood pressure causes damage. If *mildly* elevated over a *long* period of time, or if *highly* elevated over a *short* period of time, damage results to a variety of different 'target' organs in the body, primarily due to arterial injury." 2 Dan J. Tennenhouse, *Attorneys Medical Deskbook* § 24:4 (4th ed. 2012) (emphasis added); see also Norman M. Kaplan, *Clinical Hypertension* 124–25 (9th ed. 2006); Cleveland Clinic, "Pulmonary Hypertension: Causes, Symptoms, Diagnosis, Treatment," http://my.clevelandcli nic.org/disorders/pulmonary_hypertension/hic_pulmonary_ hypertension_causes_symptoms_diagnosis_treatment.aspx. The plaintiff experienced not highly elevated blood pressure for a short time or mildly elevated blood pressure for a long time, but mildly elevated blood pressure for a short time.

Hypertension is a serious condition. Untreated it can re-sult in strokes or heart attacks. But a slight elevation above the normal range in an otherwise healthy young person (like the plaintiff) for three weeks will not bring on a stroke or heart attack or even materially increase the risk of a stroke or heart attack forty or fifty years later.

The deposition of the physician who took the plaintiff's blood pressure on March 9 does not help the plaintiff's case. Regarding the March 9 reading of 142/78, she said (con-sistent with the medical literature that we've cited): "I can-not say it's a very serious, you know, condition, but it is a condition where the patient needs to take his medications." The record refers to readings of 146/90 on two occasions in May. Although these readings were higher than the March 9 reading, the physician said that the plaintiff "would not have any symptoms with this kind of blood pressure. Sel-dom do you see patients with symptoms with this kind of blood pressure."

Upon this very thin basis—the district court record con-tains not a single reference to medical literature—the plain-tiff's lawyer (who acknowledged at oral argument that he had not himself conducted any research into hypertension, and whose brief contains no references to any medical litera-ture) builds an edifice of alarm. He says that his client "be-gan to suffer bloody noses, loss of vision and visual disturb-ances, and further could have suffered even more severe ailments such as stroke or even death." The proposition that his client's not taking his blood pressure medicine for three weeks might have killed him has no medical support in the record or the medical literature.

The magistrate judge thought the plaintiff could in a trial have presented evidence permitting "a reasonable inference that [the plaintiff's] need for medication between February 27 [we don't understand the choice of that date rather than February 15] and March 6, 2009, was objectively serious." The district judge agreed that the plaintiff "suffered from an objectively serious medical condition." These observations are irrelevancies. Hypertension is a serious medical condition because of the long-term damage that it can do. But the issue in this case is whether the withholding of treatment during a brief period in the early stages of the condition in an otherwise healthy man in his mid-twenties was likely to cause serious, or indeed any, harm. The disconnect between the underlying condition and the interruption in medication is underscored by the fact noted earlier that in May, two months after the interruption had ended, the plaintiff's blood pressure was higher than it had been during the interruption.

Like the lawyers, the two judges made no reference to any medical literature. They could have skipped all medical questions, relying entirely on the lack of evidence of deliberate indifference by either defendant. But if they were going to venture an opinion on the "objective seriousness" of the plaintiff's "medical condition," they had to get the condition right—which was not hypertension but the medical consequences, in fact negligible, of a three-week deprivation of medicine for mild, early-stage hypertension. No matter how serious a medical condition is, the sufferer from it cannot prove tortious misconduct (including misconduct constituting a constitutional tort) as a result of failure to treat the condition without providing evidence that the failure caused injury or a serious risk of injury. For there is no tort—

common law, statutory, or constitutional—without an injury, actual or at least probabilistic. *Rozenfeld v. Medical Protective Co.*, 73 F.3d 154, 155–56 (7th Cir. 1996); *Buckley v. Fitzsimmons*, 20 F.3d 789, 796 (7th Cir. 1994); cf. *Codd v. Velger*, 429 U.S. 624 (1977) (per curiam). ("A probabilistic harm, if nontrivial, can support standing." *Walters v. Edgar*, 163 F.3d 430, 434 (7th Cir. 1998), and cases cited there.) As explained in *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007), "In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm. That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental" (citations omitted).

To determine the effect on the plaintiff's health of a temporary interruption in his medication, the lawyers in the first instance, and if they did their job the judges in the second instance, would have had to make some investment in learning about the condition. That could have taken the form of a judge's appointing a neutral expert under Fed. R. Evid. 706, or insisting that the plaintiff's lawyer obtain an expert's affidavit, or just consulting a reputable medical treatise. The legal profession must get over its fear and loathing of science.

As a detail we point out that this plainly meritless suit was filed on September 2, 2009—more than four years ago. The intervening years have been consumed largely by procedural wrangling and protracted, tedious depositions. A stronger judicial hand on the tiller could have saved a good deal of time, effort, and paper.

AFFIRMED.

BAUER, *Circuit Judge,* concurring in the result. I join the opinion insofar as it affirms the grant of summary judgment to the defendants. But as Judge Posner points out, many lawyers decided against medical school because of lack of interest in the clinical aspects of medicine or a deeper interest in the less scientific aspects of law. I was one of those who chose law as opposed to medicine.

I think that the opinion made the necessary legal point when it said that the record shows that summary judgment was clearly the right decision. That's where I would stop.