1
 2026 CO 35 In re the Marriage of Nicholas Jay Dale Petitioner and Nicole Jehlicka Dale., Respondent: No. 25SC220Supreme Court of Colorado, En BancMay 26, 2026
          
 Certiorari to the Colorado Court of Appeals Court of Appeals
 Case No. 24CA1065
 
 
          
 Attorney for Petitioner: Henry L. Solano
 
 
          
 Denver, Colorado
 
 
          
 Attorneys for Respondent:
 
 
           KHM
 Attorneys at Law
 
 
          
 Alexander Masterson
 
 
          
 Colorado Springs, Colorado
 
 
           Law
 Office of Joel M. Pratt
 
 
           Joel
 M. Pratt
 
 
          
 Colorado Springs, Colorado
 
 2
 
          
 JUSTICE SAMOUR delivered the Opinion of the Court, in which
 CHIEF JUSTICE MARQUEZ, JUSTICE BOATRIGHT, JUSTICE HOOD, and
 JUSTICE BLANCO joined. JUSTICE BERKENKOTTER, joined by
 JUSTICE GABRIEL, concurred in the judgment.
 
 
          
 OPINION
 
 3
 
          
 SAMOUR, JUSTICE.
 
 
          ¶1
 Not all adjustments to parenting time rights are cut from the
 same cloth -some modify those rights while others restrict
 them. Colorado law distinguishes between modifications and
 restrictions, and this case requires us to explore where the
 difference lies.
 
 
          ¶2
 The statute before us permits courts to "modify"
 parenting time rights-including by reducing the quantity of
 parenting time -if such modification is in "the best
 interests of the child." § 14-10-129(1)(a)(I),
 C.R.S. (2025). But there is a wrinkle: Courts may not
 "restrict" parenting time rights unless they find
 "that the parenting time would endanger the child's
 physical health or significantly impair the child's
 emotional development." § 14-10-129(1)(b)(I). Thus,
 in the realm of parenting time rights, the legislature
 separated modification from restriction,
 assigning one standard to guide the former and another to
 steer the latter-leaving no room for the two categories to
 merge.[1]
 
 
          ¶3
 Nicholas Jay Dale ("Father") nevertheless argues
 that an order modifying parenting time rights by
 substantially reducing the quantity of parenting
 time drifts into the restriction zone and therefore
 triggers the heightened endanger/impair
 
 4
 
 standard. But Father's contention runs headlong into a
 fundamental barrier - the familiar principles of statutory
 construction.
 
 
          ¶4
 Those principles carry the day here. We conclude that a
 purely quantitative reduction in parenting time
 -i.e., a reduction unaccompanied by qualitative
 constraints on the manner, location, or environment in which
 a parent exercises parenting time-cannot amount to a
 restriction of parenting time rights unless the reduction
 eliminates parenting time altogether.[2] We further conclude that a
 restriction of parenting time rights refers to the complete
 elimination of any quantity of parenting time (i.e.,
 zero parenting time) or to qualitative constraints
 on the manner, location, or environment in which a parent
 exercises parenting time.
 
 
          ¶5
 This is not to say that placing any qualitative term or
 condition on parenting time-including a minor
 one-constitutes a restriction. To be clear, to constitute a
 restriction, a qualitative adjustment must amount to a
 qualitative constraint - an adjustment that
 circumscribes the manner, location, or environment in which a
 parent exercises parenting time, including, for example,
 requiring that parenting
 
 5
 
 time be supervised, prohibiting overnight visits, or
 specifying the location where parenting time may take place.
 
 
          ¶6
 Thus, a restriction is either a quantitative reduction to
 zero parenting time or the imposition of qualitative
 constraints on parenting time; any other adjustment is merely
 a modification. This reading of modification and
 restriction exposes one of the insurmountable flaws
 in Father's approach. Were we to agree with Father -and
 accept that any substantial reduction in the quantity of
 parenting time constitutes a restriction rather than a
 modification -we would be required to find that the
 legislature meant to allow courts to award some parenting
 time free from any qualitative constraints, even after a
 factual finding that such parenting time would endanger the
 child's physical health or significantly impair the
 child's emotional development. That would be absurd, and
 we must sidestep interpretations that would lead a statutory
 provision into absurdity. When a court makes a finding of
 endangerment or impairment, there is no scenario in which
 even a single day of parenting time free from qualitative
 constraints is appropriate.
 
 
          ¶7
 In this case, the district court reduced the quantity of
 Father's parenting time by forty-five days, or 28.1%,
 which we assume without deciding constituted a substantial
 reduction. But because the court did not eliminate or
 otherwise qualitatively constrain Father's parenting
 time, it did not restrict it; instead, it
 
 6
 
 merely modified it. Accordingly, the court did not err in
 applying the best-interests standard rather than the
 endanger/impair standard.
 
 
          ¶8
 A division of the court of appeals navigated to the same
 pier. Accordingly, we affirm its judgment and remand the case
 with instructions to return it to the district court.
 
 
          I.
 Facts and Procedural History
 
 
          ¶9
 Father and Nicole Jehlicka Dale ("Mother") executed
 a memorandum of understanding allocating parental
 responsibilities for their young child. The district court
 approved the memorandum and incorporated it into the decree
 invalidating the parties' marriage. The decree allocated
 parenting time to Mother during 205 overnights of the year
 and to Father during the remaining 160 overnights of the
 year. Thus, the decree designated Mother as the primary
 residential parent.
 
 
          ¶10
 Less than eighteen months later, Father's work
 responsibilities changed, requiring him to stay overnight
 more than 100 miles away from the child's primary
 residence several days a week. To accommodate his new
 schedule, Father filed a motion to modify parenting time: He
 sought parenting time from Friday to Monday during the first
 three weekends of every month plus an increase in his summer
 parenting time. Father's proposed modification netted the
 same number of overnights he already had with the child per
 year (i.e., 160).
 
 7
 
          ¶11
 Mother objected to any modification. In the alternative, she
 suggested adjustments to Father's parenting time during
 the school year: every other weekend and a midweek overnight
 every week.
 
 
          ¶12
 At the end of a hearing, the district court made oral
 findings applying the best-interests standard. The court
 agreed with Father that a modification in parenting time was
 necessary. It observed, however, that Father's distance
 from the child during part of the workweek made its decision
 challenging.
 
 
          ¶13
 In a written order issued after the hearing, the court
 changed Father's parenting time to the following: during
 the school year, from Friday to Monday on alternating
 weekends, from Friday to Monday on the fifth weekend of any
 month with five weekends, and for the entire week of spring
 break; and during the summer, on alternating weeks. The court
 kept Father's holiday parenting time intact. Father's
 new parenting time schedule totaled approximately 115
 overnights with the child per year -about forty-five fewer
 than the 160 originally allocated to him, a reduction of
 28.1%.[3]
 
 8
 
          ¶14
 Father appealed, contending that such a substantial reduction
 in the quantity of his parenting time constituted a
 restriction and required a more exacting showing: a factual
 finding that parenting time would endanger the child's
 physical health or significantly impair the child's
 emotional development. Because the district court had applied
 the less rigorous best-interests standard instead, Father
 urged that the judgment be reversed.
 
 
          ¶15
 A division of the court of appeals affirmed in a published,
 unanimous opinion. In re Marriage of Dale, 2025 COA
 29, ¶ 36, 568 P.3d 1282, 1289. The division rejected
 Father's position for several reasons.
 
 
          ¶16
 First, the division determined that defining
 "restrict" in section 14-10-129 to include
 substantial reductions in the quantity of parenting time
 would leave part of subsection (2) in the same statute with
 little work to do, effectively turning it into a dead letter.
 Id. at ¶ 20, 568 P.3d at 1287. As relevant
 here, section 14-10-129(2) states that a court may not modify
 an order granting parenting time rights in a way that both
 "substantially changes the parenting time" and
 "changes the [parent] with whom the child resides a
 majority of the time" unless it makes one of four
 possible findings, including one requiring satisfaction of
 the endanger/impair standard governing restrictions of
 parenting time rights.
 
 9
 
 § 14-10-129(2)(d). The division reasoned there would be
 no need to include this possible finding in subsection (2) if
 the endanger/impair standard already applies whenever there
 is a substantial reduction in the quantity of parenting time.
 Dale, ¶ 21, 568 P.3d at 1287. Differently put,
 the division perceived that applying the endanger/impair
 standard as Father suggested would turn part of subsection
 (2) into surplusage - a statutory decoration.
 
 
          ¶17
 Second, the division explained that treating some reductions
 in the quantity of parenting time as restrictions would leave
 courts without a yardstick to determine when a reduction
 becomes substantial enough to trigger the more rigorous
 endanger/impair standard. Id. at ¶ 22, 568 P.3d
 at 1287. The division noted that section 14-10-129 is mum on
 this point. Id.
 
 
          ¶18
 Third, the division observed that most states draw the
 restriction line at denying parenting time altogether or
 allowing only supervised parenting time. Id. at
 ¶ 26, 568 P.3d at 1288. In this regard, the division
 underscored our legislature's directive to construe
 section 14-10-129 with an eye toward staying in step with
 other states that have also enacted the Uniform Dissolution
 of Marriage Act. Id. at ¶ 23, 568 P.3d at
 1287-88.
 
 
          ¶19
 Lastly, the division discerned that when, as here, life
 happens and family realities shift, a child's best
 interests may call for a recalibration of the quantity of
 parenting time, and the division saw no indication that the
 legislature intended to
 
 10
 
 freeze a court's discretion by prohibiting a substantial
 quantitative reduction in parenting time without satisfying
 the endanger/impair standard. Id. at ¶¶
 29-31, 568 P.3d at 1288-89.
 
 
          ¶20
 The division ultimately concluded that a quantitative
 reduction in parenting time is not a restriction on parenting
 time rights. Id. at ¶ 32, 568 P.3d at 1289.
 Instead, explained the division, a restriction on parenting
 time rights concerns qualitative constraints on parenting
 time - adjustments that circumscribe "the manner,
 location, or environment in which the parent engages in
 parenting time, such as a requirement that parenting time be
 supervised, a prohibition of overnight visits with a
 particular parent, or a limitation on the location where a
 parent may exercise parenting time." Id.
 
 
          ¶21
 The division acknowledged that another division, in In re
 Marriage of West, 94 P.3d 1248, 1251 (Colo.App. 2004),
 had earlier implied in dicta that a quantitative reduction-if
 sufficiently substantial-could amount to a restriction and
 thus implicate the endanger/impair standard. Dale,
 ¶ 19, 568 P.3d at 1287. To the extent West
 could be read to suggest as much, the division in this case
 plotted a different course. Id. at ¶ 32, 568
 P.3d at 1289.
 
 11
 
          ¶22
 Father's petition for certiorari flagged this question
 for our attention, and we responded by placing the case on
 our docket.[4]
 
 
          II.
 Analysis
 
 
          ¶23
 We embark on our analytical voyage by identifying the
 standard of review and revisiting familiar principles of
 statutory interpretation. From there, we sail to section
 14-10-129, whose relevant provisions -properly construed -
 compel us to reject Father's interpretation. We determine
 that a quantitative reduction in parenting time-however
 substantial-remains a modification and cannot be recast as a
 restriction. In so doing, we reason that our General Assembly
 carved two distinct channels-modifications governed by the
 best-interests standard, and restrictions governed by the
 more demanding endanger/impair standard -and just as two
 channels cannot merge without losing their boundaries,
 quantitative reductions cannot flow into the territory
 reserved for restrictions. Accordingly, we ultimately hold
 that a restriction arises only when a court either zeros out
 
 12
 
 parenting time altogether or places qualitative constraints
 on how parenting time is exercised - constraints on the
 manner, location, or environment of parenting time, such as
 supervision requirements, prohibitions on overnight visits,
 or limits on where parenting time may occur.
 
 
          ¶24
 Applying this holding here, we conclude that, since the
 district court neither eliminated nor qualitatively
 constrained Father's parenting time, it did not restrict
 his parenting time-it simply modified it. Therefore, the
 district court properly applied the best-interests standard
 rather than the endanger/impair standard. And because the
 division sailed to the same harbor, we affirm.
 
 
          A.
 Standard of Review and Familiar Principles of Statutory
 Interpretation
 
 
          ¶25
 At bottom, this case rises or falls on our interpretation of
 section 14-10-129. Statutory interpretation presents a
 question of law that is subject to de novo review. In re
 Marriage of Wollert &Joseph, 2020 CO 47, ¶ 20,
 464 P.3d 703, 709.
 
 
          ¶26
 When construing a statute, we strive to effectuate the
 legislature's intent. Id. To discern that
 intent, we examine "the entire statutory scheme,"
 giving "consistent, harmonious, and sensible effect to
 all parts" and attributing the words and phrases
 "their plain and ordinary meaning." Vallagio at
 Inverness Residential Condo. Ass'n v. Metro. Homes,
 Inc., 2017 CO 69, ¶ 16, 395 P.3d 788, 792 (quoting
 Pulte Home Corp. v. Countryside Cmty. Ass'n,
 2016 CO 64, ¶ 24, 382 P.3d 821, 826). If a statute is
 clear and unambiguous, the cardinal rule regarding plain and
 ordinary
 
 13
 
 meaning is our first and final step -there is no need to
 resort to additional interpretive instruments in the toolkit.
 Wollert, ¶ 20, 464 P.3d at 709; see also
 Carrera v. People, 2019 CO 83, ¶ 18, 449 P.3d 725,
 729 (explaining that when we are able to give statutory
 language its plain and ordinary meaning, we "look no
 further" because "nothing more is required of the
 judicial inquiry").
 
 
          ¶27
 Still, there are companion principles in the
 statutory-construction atlas that ferry alongside the rule of
 plain and ordinary meaning. A couple of those are relevant
 here. First, we will not adopt an interpretation that renders
 any portion of a statute superfluous or meaningless.
 Spahmer v. Gullette, 113 P.3d 158, 162 (Colo. 2005).
 And second, we will not construe a statute in a manner that
 yields absurd results. In re Marriage of Roosa, 89
 P.3d 524, 528 (Colo.App. 2004) ("We presume that the
 legislature intends a just and reasonable result when it
 enacts a statute ....").
 
 
          B.
 Our Interpretation of the Relevant Provisions of Section
 14-10-129 Requires Us to Reject Father's
 Interpretation
 
 
          ¶28
 Section 14-10-129(1)(a)(I) ("subsection (1)(a)(I)")
 states that, "[e]xcept as otherwise provided in
 subsection (1)(b)(I) . . ., the court may . . . modify an
 order granting or denying parenting time rights whenever such
 . . . modification would serve the best interests of the
 child." In turn, section 14-10-129(1)(b)(I)
 ("subsection (1)(b)(I)") provides that "[t]he
 court shall not restrict a parent's parenting time
 
 14
 
 rights unless it finds that the parenting time would endanger
 the child's physical health or significantly impair the
 child's emotional development."
 
 
          ¶29
 Father maintains that a modification that substantially
 reduces the quantity of parenting time spills over into
 territory reserved for restrictions, thereby triggering the
 stricter of the two standards - the endanger/impair standard.
 In other words, Father posits that, in the quantitative
 dimension of parenting time, there is no such thing as a
 substantial modification because every substantial
 modification crystalizes into a restriction. According to
 Father, trial courts have two courses to choose from when
 altering the quantity of parenting time: an insubstantial
 reduction, which would count as a modification; or a
 substantial reduction, which would count as a restriction.
 Not so. As we demonstrate, Father's argument cannot
 remain afloat.
 
 
          ¶30
 Neither "modify" nor "restrict" is
 defined in section 14-10-129, and consulting their dictionary
 definitions doesn't move the needle. But that doesn't
 leave us at a loss. We are able to discern the
 legislature's intent by looking at the statutory scheme
 as a whole and applying three interpretative commandments
 that operate in tandem-thou shalt give effect to the plain
 and ordinary meaning of words, thou shalt not render any term
 superfluous, and thou shalt avoid absurd results.
 
 15
 
          ¶31
 Subsection (1)(a)(I) authorizes the court to modify
 parenting time rights when doing so is in the child's
 best interests, and subsection (1)(b)(I) empowers the court
 to restrict those rights only upon finding that
 parenting time would physically endanger the child or
 emotionally impair the child's development. Giving the
 words in these subsections their plain and ordinary meaning,
 it becomes clear that the legislature laid out two different
 pathways - modification and restriction -the former governed
 by the best-interests standard and the latter governed by the
 endanger/impair standard. A trial court must therefore choose
 which pathway to take; it may not travel both at once.
 
 
          ¶32
 Importantly, the statutory text telegraphs the
 legislature's intent to permit substantial
 modifications of parenting time, which necessarily
 include substantial reductions in the quantity of parenting
 time. Section 14-10-129(1.5) expressly refers to a
 party's filing of "a motion for a substantial
 modification of parenting time which also changes the
 party with whom the child resides a majority of the
 time." (Emphasis added.) Likewise, section 14-10-129(2)
 ("subsection (2)") prohibits the court from
 modifying parenting time in a way that
 "substantially changes the parenting time as
 well as changes the party with whom the child resides a
 majority of the time" unless the court makes one of four
 possible findings. (Emphasis added.) These provisions show
 that the legislature not only contemplated substantial
 modifications but expressly labeled them as such. Father
 is therefore
 
 16
 
 wrong in suggesting that substantial modifications to the
 quantity of parenting time stand erased by virtue of
 supposedly coalescing into restrictions. If the legislature
 had meant to collapse all substantial reductions in the
 quantity of parenting time from the domain of modifications
 to that of restrictions, as Father urges, it would have
 drafted the statute accordingly. It did not.
 
 
          ¶33
 Moreover, had the legislature intended a substantial
 reduction in parenting time to automatically harden from a
 modification into a restriction, it presumably would have
 provided a clear benchmark indicating where that shift
 occurs. In the absence of such direction, Father's
 construction would force courts to traverse in the dark,
 guessing how substantial a reduction must be before it
 crosses the unseen line into a restriction. Relatedly, how
 would the substantial nature of a reduction be measured - by
 the number of overnights lost, the percentage of the
 reduction, or some other metric? Again, courts would be left
 to fill the statutory gaps themselves. In any event, this
 loosey-goosey approach would all but guarantee a patchwork of
 outcomes among different judges, undermining the uniformity
 the law generally strives to achieve.
 
 
          ¶34
 The statutory architecture reveals yet another defect in
 Father's interpretation. As the division observed,
 Father's reading hollows out part of the language in
 subsection (2). One of the four findings that can justify the
 type of substantial modification set out in subsection (2) is
 that "[t]he child's present
 
 17
 
 environment endangers the child's physical health or
 significantly impairs the child's emotional development
 and the harm likely to be caused" by the change is
 outweighed by its benefits. § 14-10-129(2)(d). But if,
 as Father suggests, the endanger/impair standard already
 governs any substantial modification, what role is
 the reference to that standard in subsection (2)(d) left to
 play? None. Father's construction would drain that
 language in subsection (2)(d) of operative force, leaving it
 as an ornament on the statutory tree rather than a branch
 carrying weight. We, however, may not adopt an interpretation
 that strips any statutory words of meaning or leaves them
 without a purpose to serve. See Spahmer, 113 P.3d at
 162.
 
 
          ¶35
 Perhaps most concerning, Father's interpretation would
 steer the statute into truly absurd waters. And, as we
 observed earlier, we may not embrace an interpretation of a
 statutory provision that produces outcomes no rational
 legislature could have intended. See Roosa, 89 P.3d
 at 528.
 
 
          ¶36
 Father theorizes that the district court could have charted
 the very course it did - reducing his parenting time by about
 forty-five overnights - so long as it had first found that
 the endanger/impair standard was satisfied. In other words,
 he asserts that the court could have substantially reduced
 the quantity of his parenting time by treating his request to
 modify as a request to restrict. But this would mean the
 court could have awarded Father parenting time free of
 any
 
 18
 
 qualitative constraints even after finding that such
 parenting time would physically endanger the child or
 emotionally impair the child's development. That is a
 bridge too far. When a court finds that parenting time would
 physically endanger the child or seriously stunt the
 child's emotional development, no amount of parenting
 time unburdened by qualitative constraints is appropriate -
 not even a single day. And no sensible legislature could have
 intended otherwise.
 
 
          ¶37
 Notably, subsection 14-10-129(4) gives us a peek into the
 legislature's concern with allowing parenting time
 without qualitative constraints when the child's physical
 or emotional well-being is at risk. Under that subsection,
 even when a party moves to restrict by merely alleging that
 the child faces "imminent physical or emotional
 danger" from the parenting time at issue, the court must
 order that, pending resolution of the motion, the parenting
 time must be "supervised by an unrelated third party
 deemed suitable by the court or by a licensed mental health
 professional." § 14-10-129(4). Although the
 imminent nature of the danger addressed in this subsection is
 not present in the endanger/impair standard at play here, the
 subsection still underscores a key legislative judgment:
 parenting time that threatens to harm a child should not
 proceed unchecked - i.e., without qualitative constraints.
 And Father's reading of section 14-10-129 cannot be
 reconciled with that judgment.
 
 19
 
          C.
 The Framework That Emerges - and How It Resolves This
 Case
 
 
          ¶38
 Informed by the rule of plain and ordinary meaning and its
 kindred principles of statutory construction, we conclude
 that even a dramatic reduction in the quantity of parenting
 time cannot prompt a modification to metamorphose into a
 restriction. The General Assembly charted two distinct
 navigational routes within the statutory scheme of parenting
 time rights: modifications, governed by the best-interests
 standard; and restrictions, governed by the endanger/impair
 standard. And the two routes are designed to remain separate
 at all times. Thus, contrary to Father's contention, a
 quantitative reduction in parenting time - regardless of how
 substantial -cannot be carried across the line into the
 category the legislature marked as a restriction.
 
 
          ¶39
 We now hold that a restriction materializes only when a court
 either brings parenting time to a full stop or installs
 qualitative constraints on the manner, location, or
 environment of parenting time, including requiring supervised
 parenting time, bans on overnight visits, or limits on where
 parenting time may occur.[5] It scarcely bears stating -let alone
 substantiating with legal
 
 20
 
 authority - that depriving a parent of all parenting time is
 a restriction on parenting time rights.[6] And,
 unsurprisingly, there is no dispute in this case -and courts
 in other states have likewise recognized - that placing
 qualitative constraints on the manner, location, or
 environment in which parenting time occurs is also a
 restriction.[7]
 
 
          ¶40
 It follows that changes in parenting time constitute
 modifications, not restrictions, so long as they do not
 eradicate parenting time or otherwise impose qualitative
 constraints on parenting time. For example, had the district
 court adopted Father's suggestion, which would have
 netted him the same number of overnights per year he was
 already entitled to with the child, it still would have
 modified rather than restricted his parenting time rights.
 Similarly, had the court simply changed the location of the
 parenting time exchange from one parent's house to the
 other -a qualitative term or condition-it would have
 modified, rather than restricted, the parents' parenting
 time rights, because such an
 
 21
 
 adjustment would not have added qualitative constraints on
 parenting time. On the other hand, if the court had required
 Father to exercise parenting time only in a public space or
 only in a therapeutic setting, that would have imposed a
 qualitative constraint on his parenting time.[8]
 
 
          ¶41
 We understand that the division in West came to rest
 in an entirely different port. There, the division held that
 whether to apply the best-interests standard or the
 endanger/impair standard "may involve inquiry into both
 the quantitative and the qualitative aspects of the proposed
 change to parenting time, as well as the reason or reasons
 advanced for the change." 94 P.3d at 1251. Because the
 record did not reflect either a qualitative constraint on
 parenting time or a reason for the change that implicated the
 children's safety, that division confined its analysis to
 "which standard applies to a purely quantitative change,
 and one of relatively limited magnitude." Id.
 The West division determined that the reduction in
 parenting time from eight to six weeks did not constitute a
 restriction and thus did not implicate the endanger/impair
 standard. Id. As the division in this case noted, a
 reasonable inference can be drawn that the division in
 West was
 
 22
 
 of the view that a quantitative reduction in parenting time
 could amount to a restriction. Dale, ¶¶
 17-18, 568 P.3d at 1286-87 (citing West, 94 P.3d at
 1251).
 
 
          ¶42
 Father encourages us to follow in West's
 footsteps. We, of course, are not bound by West. We
 would be remiss, however, if we failed to note that the
 division's analysis in that case suffers from the same
 shortcomings as Father's contentions here.[9] For the same
 reasons we have already rejected Father's position, we
 now decline to adopt West's rationale.
 Accordingly, to the extent West is inconsistent with
 today's decision, it is overruled.
 
 
          ¶43
 Here, the district court reduced the quantity of Father's
 parenting time from 160 nights to approximately 115 nights.
 Because the court neither extinguished the quantity of
 parenting time nor placed qualitative constraints on the
 exercise of parenting time, it did not restrict Father's
 parenting time rights.[10] And because
 
 23
 
 the court simply modified Father's parenting time rights,
 it correctly applied the best-interests standard rather than
 the endanger/impair standard.
 
 
          ¶44
 The division reached the same determination. We therefore
 leave its judgment undisturbed.
 
 
          III.
 Conclusion
 
 
          ¶45
 For the foregoing reasons, we affirm the division's
 judgment. We remand the case to the division with
 instructions to return it to the district court.
 
 
          ¶46
 To the extent anyone reading this opinion offers an
 apocalyptic forecast, we note that the division's
 decision, which we affirm, has been on the books for over a
 year, and the sky has yet to fall. We are unmoved by
 prognostications of dire consequences and see no basis to
 expect havoc. We have full confidence in our trial court
 judges; we have no doubt that they are capable of applying
 the framework we endorse today in a balanced, common-sense
 manner that ensures both consistency and fairness.
 
 
          
 JUSTICE BERKENKOTTER, joined by JUSTICE
 GABRIEL, concurred in the judgment.
 
 24
 
          
 JUSTICE BERKENKOTTER, joined by JUSTICE GABRIEL, concurring
 in the judgment.
 
 
          ¶47
 Today, the majority announces a rule that is as consequential
 as it is absurd: A purely quantitative reduction in parenting
 time, "however substantial," can
 never constitute a restriction on parenting time
 under section 14-10-129(1)(b)(I), C.R.S. (2025)
 ("subsection (1)(b)(I)"). Maj. op. ¶ 23
 (emphasis added). The majority then "clarifies"
 that under its rule, if a mother's or father's
 parenting time is reduced, for instance, from 270 overnights
 each year to zero overnights, that is a restriction. See
 id. But if a parent's overnights are reduced from
 270 to one overnight, it is a modification, not a
 restriction. See id. The majority never really
 engages with the obvious question of why a 99.6% reduction in
 parenting time would not amount to a restriction. On the face
 of it, the majority's math isn't mathing. More
 problematically, by declaring that the best interests of the
 child standard applies to all quantitative constraints on
 parenting time, however substantial, id., the
 majority lowers the bar needed to restrict parenting time
 under subsection (1)(b)(I).
 
 
          ¶48
 Its interpretation also fails to square with common sense and
 the practical and complex realities of family relationships.
 Who wouldn't describe a 99.6% reduction in parenting time
 as a restriction?
 
 25
 
          ¶49
 The majority's interpretation of section
 14-10-129(1)(a)(I) ("subsection (1)(a)(I)") and
 subsection (1)(b)(I) is also contrary to the plain language
 of these provisions and to the General Assembly's intent
 in adopting the Uniform Dissolution of Marriage Act
 ("UDMA"), §§ 14-10-101 to -133, C.R.S.
 (2025). I am additionally concerned that in attempting to
 simplify what can be very challenging decisions for our
 courts, the majority sows havoc in those same courts. Why?
 Beyond failing to account for the complex dynamics in
 domestic relations cases - particularly in fractious ones -
 the majority doesn't consider or explain how its new rule
 will work going forward in the real world. I see a lot of
 problems on the horizon.
 
 
          ¶50
 The majority's interpretation will wreak further havoc
 because it necessarily suggests that if a party seeks to
 impose a qualitative constraint in a motion to
 modify, the district court must treat the motion as one
 seeking to restrict parenting time, no matter how the motion
 is denominated or the reason for it. To the extent the
 majority means that trial courts may no longer impose
 "qualitative constraint [ s ],"
 unless they are "qualitative term [ s
 ] or condition [ s ]" when modifying
 parenting time, Maj. op. ¶ 5 (emphases in original),
 this simply trades one line-drawing problem (the numerical
 cutoff between a modification and a restriction) for another
 (the difference between a qualitative constraint, a
 qualitative term, and a qualitative condition). This is
 especially so because none
 
 26
 
 of these terms - qualitative constraint, qualitative term, or
 qualitative condition -are mentioned, let alone defined, in
 the UDMA. This just seems to compound the problem the
 majority is trying to solve in the first place.
 
 
          ¶51
 What's worse, the majority's approach represents a
 deeply troubling sea change in the law. In so holding, it
 takes a critical tool away from courts charged with crafting
 parenting plans that are in children's best interests. I
 can't imagine this is what the General Assembly had in
 mind, and I don't see how this will make the difficult
 decisions judges have to make regarding parenting time any
 easier.
 
 
          ¶52
 I would instead adopt the more nuanced test articulated in
 In re Marriage of West, 94 P.3d 1248, 1251
 (Colo.App. 2004). It provides, "determining whether to
 apply the best interests standard or the endangerment
 standard may involve inquiry into both the quantitative and
 the qualitative aspects of the proposed change to parenting
 time, as well as the reason or reasons advanced for the
 change." Id. True, this test is not mechanical.
 See id. Nor should it be. Instead, it aligns with
 the plain meaning of the UDMA, which firmly put the focus on
 children, and it recognizes the sometimes complex and
 endlessly varied circumstances that judges face in making
 parenting time decisions and in resolving parenting time
 disputes. Because the factual circumstances underlying every
 parenting time decision are unique and must be decided on a
 case-by-case
 
 27
 
 basis, the reasons advanced by parties for changes to
 parenting time -not math - should also guide the court's
 analysis.
 
 
          ¶53
 That said, here, petitioner Nicholas Jay Dale's
 ("Father's") change in employment required him
 to work in-person four days a week more than 100 miles away
 from the child's primary residence. Applying
 West, I would conclude that the district court's
 decision - which reduced Father's parenting time by
 forty-five days and imposed no qualitative constraints-did
 not amount to a restriction and thus did not require the
 court to find endangerment under subsection (1)(b)(I).
 
 
          ¶54
 Because I disagree with the majority's interpretation of
 subsections (1)(a)(I) and (1)(b)(I) but agree that the
 district court did not err in modifying the parties'
 parenting time, I concur in the judgment only.
 
 
          I.
 Analysis
 
 
          ¶55
 First, I address the standard of review and discuss the
 principles of statutory interpretation before turning to
 subsection (1)(b)(I). By drawing upon statutory context,
 common dictionary definitions, and relevant case law, see
 Roup v. Com. Rsch., LLC, 2015 CO 38, ¶ 14, 349 P.3d
 273, 277, I conclude that the plain and ordinary meaning of
 the words "restriction" and "modify" may
 involve an evaluation of quantitative time. Therefore,
 determining whether to apply the best interests standard or
 the endangerment standard under subsection (1)(b)(I) may
 
 28
 
 involve inquiry into both the quantitative and the
 qualitative aspects of the proposed change to parenting time,
 as well as the reason or reasons advanced for the change.
 This test - and not the majority's rule - aligns with the
 plain meaning of subsection (1)(b)(I), ensures that the
 proper legal standard applies to restrictions (i.e., it
 doesn't lower the bar), more closely aligns with the
 General Assembly's legislative intent, does not create a
 new line-drawing problem for the courts, and avoids absurd
 results.
 
 
          A.
 Standard of Review and Principles of Statutory
 Construction
 
 
          ¶56
 Statutory interpretation presents a question of law that this
 court reviews de novo. Colo. Med. Bd. v. McLaughlin,
 2019 CO 93, ¶ 22, 451 P.3d 841, 845. When interpreting a
 statute, we seek to ascertain and effectuate the intent of
 the General Assembly. Cowen v. People, 2018 CO 96,
 ¶ 12, 431 P.3d 215, 218. When a term remains statutorily
 undefined, we assume the legislature "intended to give
 the term its usual and ordinary meaning." Roup,
 ¶ 8, 349 P.3d at 276. We may consult a recognized
 dictionary to further discern a term's plain meaning.
 In re Marriage of Zander, 2021 CO 12, ¶ 13, 480
 P.3d 676, 680.
 
 
          ¶57
 In interpreting the plain meaning of statutory language, we
 must also give consistent effect to all parts of the statute.
 Cowen, ¶ 13, 431 P.3d at 218. This means the
 various provisions of the UDMA must be construed together and
 harmonized with its overall legislative design.
 Zander, ¶ 14, 480 P.3d at 680. Because there is
 a
 
 29
 
 presumption that the General Assembly intends a just and
 reasonable result when enacting a statute, a statutory
 construction that defeats the legislative intent or leads to
 an absurd result will not be followed. Ingram v.
 Cooper, 698 P.2d 1314, 1315 (Colo. 1985); §
 2-4-201(1)(c), C.R.S. (2025). If the statutory language is
 clear and unambiguous, the statute is applied as written.
 Cowen, ¶ 12, 431 P.3d at 218.
 
 
          B.
 The Plain Meaning of "Restrict" and
 "Modify"
 
 
          ¶58
 As with any issue of statutory interpretation, the starting
 point is the text itself. Subsection (1)(a)(I), which governs
 a party's request to modify parenting time, provides in
 part: "Except as otherwise provided in subsection
 (1)(b)(I) of this section, the court may make or
 modify an order granting or denying parenting time
 rights whenever such order or modification would serve the
 best interests of the child." § 14-10-129(1)(a)(I)
 (emphasis added).
 
 
          ¶59
 Subsection (1)(b)(I), which addresses a party's request
 to restrict parenting time, states:
 
 
 The court shall not restrict a parent's
 parenting time rights unless it finds that the parenting time
 would endanger the child's physical health or
 significantly impair the child's emotional development.
 In addition to a finding that parenting time would endanger
 the child's physical health or significantly impair the
 child's emotional development, in any order imposing or
 continuing a parenting time restriction, the court shall
 enumerate the specific factual findings supporting the
 restriction.
 
 
 § 14-10-129(1)(b)(I) (emphasis added).
 
 30
 
          ¶60
 The legislature has not defined the term "modify,"
 nor has it defined the term "restrict." So I first
 turn to the dictionary to further discern the plain and
 ordinary meaning of these terms. See Zander, ¶
 13, 480 P.3d at 680. "Modify" can mean "to
 make minor changes." Modify, Merriam-Webster
 Dictionary, https:// www.merriam-webster.com/
 dictionary/modify [https: //perma.cc/UB3P-2PMJ].
 "Restrict" can mean limit.
 See Restriction, Black's Law Dictionary (12th
 ed. 2024). I agree with the majority that a parent's time
 with their child may be changed or limited by either (1)
 duration or (2) the manner, location, or environment in which
 the parent may exercise parenting time, or both.
 See Maj. op. ¶ 40. A common sense reading of
 these statutes thus indicates that courts may evaluate the
 quantitative and qualitative impact of a proposed change to
 parenting time when determining whether to apply the best
 interests of the child standard or the endangerment standard
 to a requested change in parenting time.
 
 
          ¶61
 By drawing from the statutory context and common dictionary
 definitions, see Roup, ¶ 14, 349 P.3d at 277,
 the plain and ordinary meaning of "restrict" and
 "modify" can be resolved with reasonable certainty.
 Simply put, a "restriction" under subsection
 (1)(b)(I) allows consideration of quantity or quality, or
 both. Concluding otherwise lowers the bar so a restriction on
 parenting time may be ordered based on the best interests of
 the child rather than on the correct legal standard:
 endangerment.
 
 31
 
          C.
 The Majority's Rule Defeats Legislative Intent and Leads
 to Absurd Results
 
 
          ¶62
 As noted, we will not interpret a statute in a manner that
 defeats its legislative intent or leads to an absurd result.
 See Ingram, 698 P.2d at 1315; see also
 § 2-4-201(1)(c). The majority's new rule,
 unfortunately, does just that.
 
 
          ¶63
 Section 14-10-102, C.R.S. (2025), and section 14-10-104.5,
 C.R.S. (2025), expressly declare the UDMA's purposes and
 policy goals. Section 14-10-102(1) provides that the purposes
 underlying the UDMA must be "liberally construed."
 Section 14-10-102(2)(b), meanwhile, explains one of the
 UDMA's purposes: "[t]o mitigate the potential harm
 to the spouses and their children caused by the process of
 legal dissolution of marriage." Section 14-10-104.5
 provides additional insight. It states that "it is in
 the best interests of the children of the marriage to have a
 relationship with both parents . . . and that, in most cases,
 it is the parents' right to have a relationship with
 their children." § 14-10-104.5. This provision
 squares with the repeated recognition by the United States
 Supreme Court that the relationship between parent and child
 is constitutionally protected. See Troxel v.
 Granville, 530 U.S. 57, 65-66 (2000).
 
 
          ¶64
 Despite the legislature's declaration, the majority
 interprets subsection (1)(b)(I) so narrowly that a
 quantitative reduction in parenting time -no matter how
 substantial - can never amount to a
 "restriction" requiring a
 
 32
 
 finding of endangerment unless it results in zero days of
 parenting time. See Maj. op. ¶ 23.
 
 
          ¶65
 This makes no sense.
 
 
          ¶66
 What if a father seeks to modify the parties' existing
 parenting plan so the mother's parenting time with the
 parties' eleven-month-old son, who is still nursing, is
 reduced from 270 overnights to one overnight. According to
 the majority, the father is not seeking to restrict the
 mother's parenting time. But if he asks the court to
 reduce her parenting time to zero overnights, the trial court
 must treat his motion to modify as a motion to restrict. That
 logic doesn't add up. A 99.6% decrease in parenting time
 would profoundly impact the child's relationship with his
 mother. No worries, the majority suggests: A party seeking
 this substantial a reduction in parenting time will always
 ask the court to impose a qualitative constraint. See
 id. at ¶ 36. Given the extraordinary number of
 self-represented litigants in domestic relations cases in
 Colorado, this seems like a very unrealistic expectation.
 See Colo. Jud. Branch, Cases and Parties Without
 Attorney Representation in Civil Cases: Fiscal Year
 2025, at 4 (July 8, 2025), https://
 www.coloradojudicial.gov/ sites/
 default/files/2025-07/FY2025-Cases-and-Parties-without-Attorney-Representation.pdf
 [https:// perma.cc/F2BA-3SJY].
 
 
          ¶67
 And what if the father's motion to modify doesn't
 seek to reduce the number of the mother's overnights, but
 instead asks the court to impose a qualitative
 
 33
 
 constraint? Under the majority's apparent reasoning, the
 court is required to treat the father's motion as a
 motion to restrict regardless of the nature of the
 qualitative constraint and even though the father is not
 seeking to reduce the mother's parenting time.
 See Maj. op. ¶ 40. The majority's reading
 of these statutes leads to absurd results because it lacks
 the nuance and discretion that the UDMA contemplates - nuance
 which allows courts to consider and craft orders on a
 case-by-case basis that focus on the needs of the children in
 the cases before them.
 
 
          ¶68
 The majority's rigid interpretation treats all
 qualitative constraints the same. But in reality, there are a
 multitude of reasons one parent may seek to impose a
 qualitive constraint on the other parent. Some of the reasons
 may arise out of concerns about endangerment, but many are
 necessary to simply facilitate a parenting time schedule that
 is in the best interests of the parties' children. For
 instance, a mother may be concerned that the father's
 serious health condition has advanced to the point that he
 needs some additional help caring for the parties'
 children in the evening after he has undergone treatment. The
 mother doesn't want to reduce the father's parenting
 time. To the contrary, she wants to support their
 children's relationship with their father, but she wants
 him to have some additional help from a family member of the
 father's choosing. He, however, doesn't think he
 needs help. Under the majority's interpretation, because
 this is a qualitative constraint, the mother would have to
 wait until the children are
 
 34
 
 physically endangered or emotionally impaired before seeking
 relief through a motion to restrict, even though -if she is
 correct -the constraint would be in the best interests of the
 children.
 
 
          ¶69
 Finally, what are courts to make of the majority's
 interpretation when it comes to motions to modify that seek
 to increase parenting time quantitatively, but with
 a qualitative constraint. Often these motions are filed by a
 parent who, having achieved a consistent, sustained level of
 sobriety, seeks to increase their parenting time while
 submitting to periodic urinalysis. Or this type of motion may
 be filed by a sixteen-year-old parent of an infant who seeks
 to increase their parenting time while offering to have their
 parent present during that time. Under the majority's
 reasoning, it appears that these motions -because they
 include a qualitative constraint-must be treated as motions
 to restrict even though they are motions to increase
 parenting time. Again, this makes no sense.
 
 
          ¶70
 I readily acknowledge that West does not provide the
 bright-line rule that the majority seeks. Its test cannot be
 mechanically or mathematically applied, but that is the
 point. Put differently, the statutes' lack of bright
 lines are a feature, not a bug. Formulaic rulings are not
 what the UDMA requires, and they are not what children and
 their parents need, particularly in high-conflict cases.
 
 
          ¶71
 The majority declares that its interpretation will help
 district court judges and avoid a patchwork of outcomes.
 Id. at ¶ 33. Not so. We trust courts to make
 
 35
 
 these tailored decisions all the time and understand that
 outcomes will necessarily and appropriately vary because no
 two cases are exactly alike. But courts need the tools the
 General Assembly has given them to craft orders that put the
 best interests of children first when modification is sought
 and to protect children via parenting time restrictions only
 when parenting time endangers a child's physical health
 or significantly impairs the child's emotional
 development. The majority's opinion strips those tools
 out of the hands of our courts and lowers the bar to restrict
 parenting time. What's more, in trying to address one
 line-drawing problem, it creates a new one that seems likely
 to spawn much future litigation: What is the difference
 between a qualitative constraint, a qualitative
 term, and a qualitative condition?
 Id. at ¶ 5. I'm not sure, in part because
 none of these terms are used in the UDMA. But it seems -
 ironically - that the reason a constraint, term, or condition
 is sought is likely relevant to answering whether the best
 interests or endangerment standard is triggered, meaning that
 the test in West is well-suited to helping draw
 these lines. Not mechanically, but on a case-by-case basis.
 
 
          D.
 The West Test Appropriately
 Considers the Reason or Reasons for Changes to Parenting
 Time
 
 
          ¶72
 The test articulated in West aligns with the
 UDMA's policy goals and its constitutional underpinnings
 and does not lead to absurd results. By focusing on the
 reason or reasons for the proposed change, the West
 test avoids predetermined
 
 36
 
 calculations and conclusions and, instead, considers the
 circumstances unique to each family - an analytical framework
 common in family law jurisprudence. See, e.g.,
 In re Marriage of Short, 698 P.2d 1310, 1312 (Colo.
 1985) (determining that child custody requires "a broad
 inquiry into all relevant factors bearing on the welfare of
 the child"); In re Marriage of Capparelli, 2024
 COA 103M, ¶ 9, 561 P.3d 417, 421 (concluding that the
 equitable distribution of martial property involves a
 consideration of a "variety of factors"); In re
 Marriage of Nelson, 2012 COA 205, ¶ 23, 292 P.3d
 1214, 1219 (noting that determining maintenance entails a
 "discretionary balancing of factors").
 
 
          ¶73
 The wisdom of the test set forth in West is
 illustrated in two cases decided by the Minnesota Court of
 Appeals-applying a provision that is similar to subsection
 (1)(b)(I). See Clark v. Clark, 346 N.W.2d 383, 386
 (Minn.Ct.App. 1984); Anderson v. Archer, 510 N.W.2d
 1, 5 (Minn.Ct.App. 1993).
 
 
          ¶74
 In Clark, 346 N.W.2d at 384-85, the court considered
 whether a gradual reduction of "reasonable and liberal
 visitation" from fourteen weeks per year to 5.5 weeks
 per year was a restriction. The court held that "the
 trial court abused its discretion in allowing the slow
 erosion of [the] appellant's rights without any showing
 pursuant to the statute that reduced visitation would
 endanger [the child's] emotional health or impair [the
 child's] emotional development." Id. at
 386.
 
 37
 
          ¶75
 In Anderson, 510 N.W.2d at 3, 5, the court
 considered whether a modification to a parenting time plan,
 which reduced the appellant's total visitation, amounted
 to a restriction. Due to the appellant's out-of-state
 employment, the original parenting time plan provided him
 with visitation when he was "in Minnesota."
 Id. at 2-3. However, the appellant later returned to
 reside in Minnesota, which in combination with the
 appellee's work schedule and the children's school
 schedule, resulted in unbalanced parenting time. See
 id. at 3. The trial court subsequently modified the
 parenting time schedule and reduced the appellant's time
 with the children. Id. at 3-4.
 
 
          ¶76
 On appeal, the court held that the reduction was not a
 restriction. Id. at 4. The court reasoned that
 changed circumstances warranted the reduction in the
 appellant's parenting time so the children's
 relationships with both parents could be maintained. See
 id. at 4-5. It added, "Even if the modification
 reduced [the] appellant's visitation time from what the
 parties intended when they entered the stipulation, in
 light of the reason for the modification and the
 substantial amount of visitation granted to [the] appellant,
 the modification did not constitute a restriction of
 visitation." Id. at 5 (emphasis added).
 
 
          ¶77
 As Clark and Anderson both illustrate, the
 reason or reasons for a proposed change in parenting time are
 important considerations when determining whether a
 quantitative reduction in parenting time constitutes a
 restriction.
 
 38
 
          ¶78
 For these reasons, and because the majority's rule
 disregards the plain meaning of subsection (1)(b)(I), lowers
 the bar to restrict parenting time, conflicts with the
 express policy goals of the UDMA, creates a whole new
 line-drawing problem regarding the difference between a
 qualitative constraint and a qualitative term, and leads to
 absurd results, I would adopt the test as articulated in
 West. That is, "determining whether to apply
 the best interests standard or the endangerment standard may
 involve inquiry into both the quantitative and the
 qualitative aspects of the proposed change to parenting time,
 as well as the reason or reasons advanced for the
 change." West, 94 P.3d at 1251.
 
 
          II.
 Application of the West
 Test
 
 
          ¶79
 Despite my disagreement with the majority's
 interpretation of section 14-10-129, I agree that the court
 below did not "restrict" Father's rights
 pursuant to subsection (1)(b)(I), and thus properly applied
 the best interests of the child standard, but I do so by
 applying the West test. Consistent with
 West, 94 P.3d at 1250, I start with the reasons for
 Father's request and the court's order.
 
 
          ¶80
 Father accepted a new job that requires him to work in-person
 more than 100 miles away from the child's primary
 residence. He then sought to adjust the parties'
 parenting time schedule to accommodate his new schedule.
 While the proposed schedule would have better suited
 Father's needs, the district court was not persuaded that
 it was in the best interests of the parties' child.
 
 39
 
          ¶81
 In its ruling, the court acknowledged that the decision to
 modify the original parenting schedule was "not an easy
 [one]" and would "likely disappoint both
 parties." In its order, the court found, "[T]he
 distance between the parties based on [F]ather's
 employment does impact the court's ability to fashion an
 appropriate parenting plan. Likewise, the court finds the
 lengthy travel does impact the child." In re
 Marriage of Dale, No. 21DR32791, at 3 (Dist. Ct., El
 Paso Cnty., Apr. 26, 2024) (unpublished order).
 
 
          ¶82
 The district court further explained that the change would
 reduce the number of parenting time exchanges -an important
 consideration, it noted, because the child showed signs of
 separation anxiety when parting with either parent.
 Id. at 2. So, even though the court reduced
 Father's parenting time, the reduction did not-in light
 of the reasons for the modification and the otherwise
 substantial parenting time granted to Father-constitute a
 restriction under subsection (1)(b)(I).
 
 
          III.
 Conclusion
 
 
          ¶83
 Because the majority's interpretation disregards the
 plain meaning of subsection (1)(b)(I), lowers the restriction
 bar, conflicts with the express policy goals of the UDMA,
 creates a new line-drawing problem, and leads to absurd
 results, I respectfully concur in the judgment only.
 
 
 ---------
 
 
 Notes:
 
 
 [1] For the sake of brevity, this opinion
 sometimes refers to the modification standard as the
 "best-interests standard" and to the restriction
 standard as the "endanger/impair standard."
 
 
 [2] To avoid repetition, moving forward,
 unless we specify otherwise, when we refer to reductions in
 the quantity of parenting time, we mean: reductions (1) that
 are purely quantitative (i.e., free from qualitative
 constraints on the manner, location, or environment in which
 a parent exercises parenting time); and (2) that do not
 eliminate parenting time altogether (i.e., reductions to
 something other than zero days).
 
 
 [3] The district court indicated that its
 modification of parenting time would give Father 142
 overnights with the child per year. Before us, counsel
 disagree with that number but also with each other's
 math. "Innumerable are the lawyers who explain that they
 picked law over a technical field because they have a
 'math block' . . . ." Jackson v.
 Pollion, 733 F.3d 786, 788 (7th Cir. 2013) (quoting
 David L. Faigman, et al., Modern Scientific Evidence:
 Standards, Statistics, and Research Methods v (student
 ed. 2008)); see also Owens v. Carlson, 2022 CO 33,
 ¶ 1, 511 P.3d 637, 639 ("[T]here is no question
 that some lawyers and math just don't mix."). We
 need not get in the middle of this arithmetic tug-of-war.
 Instead, we assume for purposes of our analysis that
 Father's calculations are correct.
 
 
 [4] We agreed to review two
 issues:
 
 
 1. Whether the court of appeals erred in holding that
 quantitative reductions in parenting time regardless of
 amount are not restrictions on parenting time rights under
 section 14-10-129(1)(b)(I), C.R.S. (2024).
 
 
 2. Whether a forty-five-day (28.1%) reduction in
 previously ordered parenting time is a restriction on
 parenting time rights absent endangerment to the
 child.
 
 
 [5] The division reached a similar
 holding. We observe, however, that it did not address the
 possibility of reducing the quantity of parenting time by
 snuffing it out altogether. Its reasoning suggests that such
 a reduction would constitute a restriction, but it stopped
 short of saying so explicitly. Today, we make express that
 which the division merely implied.
 
 
 [6] Zero days of parenting time marks the
 only defensible line of demarcation. Recall that the
 legislature furnished no barometer because it did not
 contemplate that substantial quantitative reductions would
 morph into restrictions in the first place.
 
 
 [7] Courts outside Colorado addressing
 restrictions on parenting time have focused on the
 constraints placed on the exercise of parenting time rights,
 such as requiring supervised parenting time, limiting
 parenting time to a prescribed location, or outright denying
 parenting time. See, e.g., Gonzalez-Gunter v.
 Gunter, 471 P.3d 1024, 1027 (Ariz.Ct.App. 2020);
 Fulton v. Fulton, 918 So.2d 877, 881 (Miss. Ct. App.
 2006).
 
 
 [8] It is not feasible to exhaustively
 catalogue all qualitative constraints on parenting time. In
 assessing whether an adjustment qualifies as such a
 constraint, trial courts should ask whether it circumscribes
 the manner, location, or environment in which parenting time
 is exercised. Judicial officers must be mindful that
 qualitative constraints are adjustments that can be justified
 only by meeting the endanger/impair standard.
 
 
 [9] By way of example, the West
 division did not explain how trial courts are to determine
 when a reduction in the quantity of parenting time becomes so
 substantial that it is transformed into a restriction.
 West's loosely constructed approach is as
 shapeless as fog and amounts to a line drawn in water -
 impossible to discern and incapable of uniform application.
 It would place our trial courts in an untenable position and
 lead to disparate results.
 
 
 [10] We recognize, as did the division,
 that a court could all but terminate a party's parenting
 time without applying the endanger/impair standard by
 reducing the quantity of parenting time to a single overnight
 per year. But such a court would still have to apply the
 best-interests standard, and it is difficult to conceive of
 circumstances in which a single overnight of parenting time
 would serve the child's best interests. Even so, we trust
 our trial courts and have no reason to believe they will act
 in bad faith. And it goes without saying that parties are
 obviously free to appeal an order imposing such a
 reduction.
 
 
 ---------